**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**July 24, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

BOB BURRELL and SUSAN
BURRELL,

     Plaintiffs-Appellants,

v.

LEONARD ARMIJO, Governor of Santa
Ana Pueblo and Acting Chief of Santa
Ana Tribal Police; LAWRENCE
MONTOYA, Lt. Governor of Santa Ana
Pueblo; NATHAN TSOSIE, Tribal
Administrator of Santa Ana Pueblo;
JERRY KINSMAN, Farm Administrator
of Santa Ana Pueblo; SANTA ANA
PUEBLO,

     Defendants-Appellees.

No. 03-2223

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. No. CIV 02-542 WJ/DJS)**

---

Chris Lucero, Jr., Albuquerque, New Mexico, for plaintiffs-appellants.

Richard W. Hughes (Caren I. Friedman, with him on the brief), Rothstein, Donatelli,
Hughes, Dahlstrom & Schoenburg, LLP, Santa Fe, New Mexico, for defendants-
appellees.

---

Before **BRISCOE, McWILLIAMS,** and **McCONNELL**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

Bob and Susan Burrell ("the Burrells") filed this action against the Santa Ana Pueblo ("the Pueblo"), a federally recognized Indian tribe; Leonard Armijo, Governor of the Pueblo; Lawrence Montoya, Lieutenant Governor of the Pueblo; Nathan Tsosie, Tribal Administrator of the Pueblo; and Jerry Kinsman, Farm Administrator of the Pueblo, for violations of their civil rights pursuant to 42 U.S.C. §§ 1981, 1983, and 1985, as well as claims for breach of a federal farm lease and "respondeat superior." The district court initially stayed the case so that the Burrells could exhaust their tribal court remedies. After the Santa Ana Pueblo Tribal Court ruled that the Pueblo and the named tribal officials were entitled to sovereign immunity, the district court ruled that the tribal court's decision was entitled to preclusive effect and dismissed the Burrells' case. The Burrells now appeal. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we hold that the district should not have given preclusive effect or otherwise recognized the tribal court's ruling, and therefore reverse and remand the case for further proceedings consistent with this opinion.

I. FACTUAL BACKGROUND[1]

In May 1980, the Burrells entered into a ten-year farming lease with the Pueblo for approximately 172 acres of the Pueblo's land.[2] According to the Burrells, they were

---

[1] The following facts are taken from the Burrells' complaint. We assume the truth of these facts for purposes of this appeal.

[2] At oral argument, counsel for the Pueblo stated that although the United States

informed that if they conducted a successful farming operation, the lease would be renewed for as long as they lived. As a result, the Burrells obtained farm loans from the Farmer's Home Administration ("FHA") and invested their personal assets in order to purchase equipment and other materials necessary to run a farm. In February 1985, the Tribal Council of the Pueblo (the "tribal council") extended the lease until September 2000 so that the Burrells could refinance their FHA loans.

The Burrells integrated themselves into the ways of the Pueblo and, in their own words, were "sometimes" treated "more than fair" by Pueblo officials. The Burrells assert, however, that over the years Pueblo officials subjected them to various forms of discrimination. See App. at 12-13. For example, the Burrells claim that Pueblo officials prohibited them from driving their farm equipment along paved roads, prevented them from using more than a couple of horseback riders to move their cattle, and refused to permit construction of concrete ditches in their fields–all while allowing tribal members these privileges.

The Burrells allege that the discrimination against them worsened in early 1997 when acting Chief of Police Leonard Armijo became Governor of the Pueblo. In June 1997, Governor Armijo allegedly ordered them to quit bailing hay at night, even though tribal members were permitted to do so. Moreover, the Burrells maintain that other

---

Department of Interior possessed authority over the lease, the Pueblo's consent to the lease was necessary. Furthermore, counsel noted that the Pueblo could not unilaterally terminate the lease, but was required to contact the United States Department of Interior to initiate such proceedings.

Pueblo officials, including Lieutenant Governor Lawrence Montoya, Tribal Administrator Nathan Tsosie, and Farm Administrator Jerry Kinsman, refused to interfere with Governor Armijo's order and worked with him to drive them off their farm. App. at 14.

In July 1997, Lieutenant Governor Montoya inquired as to what amount the Burrells would accept from the Pueblo to buy out the farm lease. The Burrells proposed $500,000. On July 24, the Burrells contend that the tribal council voted to buy out the lease for $500,000 and that a tribal member informed them that the vote was 47-2. That same month, the Burrells allege that Farm Administrator Kinsman ordered tribal farm crews to take over their farm.

The Burrells assert that Governor Armijo, Lieutenant Governor Montoya, Tribal Administrator Tsosie, and Farm Administrator Kinsman (hereinafter "the individual tribal officials") refused to comply with the tribal council's resolution to buy out the Burrells for $500,000. Instead, they proceeded to negotiate for less money. The Burrells allege that the individual tribal officials lacked the authority to refuse to put into effect the tribal council's resolution.

On August 15, 1997, the individual tribal officials allegedly hired others to bale the Burrells' hay crop and then distributed part of the crop to Pueblo members. The Burrells claim that this conduct amounted to larceny. On August 25, the Burrells removed their two mobile homes and all of their farm equipment from the leased land. A few days later, the individual tribal officials and their attorney met with the Burrells and offered them the following package: $218,000 to pay off their FHA loan; three years of

health insurance; a home lot off of the Pueblo for the mobile homes; and to hire Mr. Burrell as farm manager for the Pueblo. The Burrells contend that the individual tribal officials withdrew the offer on September 23, but that the tribal council voted to reinstate the offer on September 25. In October 1997, the Burrells, through their attorney, demanded all tribal council records dealing with their farm lease to "see if there [was] any possibility of avoiding litigation." By January 1998, the tribal council had passed a resolution rescinding the September 1997 offer to the Burrells.

It is the Burrells' position that the individual tribal officials intentionally ran them off their farm, stole their crops, terminated their lease, and discriminated against them on account of their race (non-Indian). Aplt. Br. at 13.

II. PROCEDURAL HISTORY

*A.   Administrative Proceedings Before the Bureau of Indian Affairs, United States Department of Interior*

The Burrells' complaint asserts that beginning in 1997, the Pueblo officials falsely informed the Bureau of Indian Affairs ("BIA") that they abandoned their farm, violated their lease, and defaulted on their FHA loan and water rights assessments. App. at 17.

A tribal council resolution dated October 1, 1998, stated that the Burrells abandoned their lease in the summer of 1997 and requested that the BIA institute proceedings to terminate the farm lease. Id. at 41. A letter dated February 11, 1999, from the Superintendent of the Southern Pueblos Agency, BIA, United States Department of Interior, notified the Burrells that the farm lease was cancelled. Id. at 43-44. The

Superintendent cited the Burrells' failure to keep their performance bond up to date, the tribal council's October 1998 resolution, and delinquent operations and maintenance charges as reasons for the decision. The Superintendent also noted the Burrells' failure to respond to the office's prior requests for information. Id.

The Burrells appealed that decision to the Albuquerque Area Office, BIA, United States Department of Interior. On May 26, 1999, the Area Director affirmed the Superintendent's decision to cancel the lease. Id. at 45. In particular, the Area Director observed that the Burrells sent a letter dated June 22, 1998, to the Superintendent, complaining that discrimination from Pueblo officials amounted to a constructive termination and breach of the lease. Id. at 48. That June 1998 letter stated, in relevant part: "[The Burrells] did not voluntarily abandon their lease, but instead were illegally driven off their lands which they worked peacefully for 17 years, all because of the prejudice of a few tribal officials. The imposition of a performance bond under these circumstances is not proper." Id. at 53. Additionally, the Area Director stated that the Burrells did not dispute the violations cited by the Superintendent, but that the Burrells' attorney advised the office that it faced federal litigation if it continued to refuse to enforce the Burrells' contractual and constitutional rights. Id. at 48. The Area Director concluded that the Burrells' claims failed to excuse their multiple breaches under the lease. Id. at 49.

The Burrells appealed the Area Director's decision to the Interior Board of Indian Appeals ("IBIA"), United States Department of Interior. The IBIA affirmed the Area

Director's decision on May 17, 2000. Id. at 52. The IBIA held that the BIA did not have a trust duty toward the Burrells, rejecting the Burrells' argument that the lease violations should be excused because of the BIA's failure to investigate their allegations against the Pueblo. Id. at 55. Specifically, the IBIA determined that the Burrells reported the allegations of discrimination to the BIA long after they were in violation of the lease. Id. Therefore, the IBIA concluded that the BIA's failure to investigate those allegations was not the cause of the Burrells' lease violations. Id.

The Burrells did not seek federal court review of the IBIA's decision.

*B. Federal Court and Tribal Court Proceedings*

On April 14, 1998, the Burrells filed an action in the United States District Court for the District of New Mexico, Burrell v. Armijo, et al., CIV 98-0438 JC/WWD, alleging civil rights claims under 42 U.S.C. §§ 1981, 1983, and 1985, as well as a separate count based on "respondeat superior," against the Pueblo and the individual tribal officials. App. at 21, 226-45. The district court dismissed that action without prejudice because of the Burrells' failure to exhaust tribal court remedies, following the Supreme Court's decisions in National Farmers Union Insurance Companies v. Crow Tribe, 471 U.S. 845 (1985) and Iowa Mutual Insurance Company v. LaPlante, 480 U.S. 9 (1987). Id. at 21, 246-52. In particular, the district court rejected the Burrells' contentions that the exhaustion rule did not apply because the tribal court lacked jurisdiction over their BIA lease and civil rights claims. Id. at 250. The district court found that the Burrells' complaint could not be construed to claim a remedy under the provisions of the BIA

lease, and that the Burrells failed to "cite any express jurisdictional prohibitions which prevent tribal courts from hearing their civil rights claims." Id. The Burrells did not appeal that decision.

On October 29, 1998, the Burrells re-filed their lawsuit in the Santa Ana Tribal Court (hereinafter "tribal court").[3] In that action, the Pueblo and the individual tribal officials filed a motion to dismiss on the grounds of tribal sovereign immunity and failure to state a claim. Meanwhile, the Burrells filed several motions, including motions to compel discovery, a motion for an evidentiary hearing, and a motion for a temporary restraining order and/or a preliminary injunction to prevent tribal officials from harassing tribal members who provided assistance to the Burrells. Tribal Judge Floyd J. Kezele held two evidentiary hearings on all pending matters on February 29, 2000, and March 21, 2000. App. at 23. By May 2002, Judge Kezele had not issued any decisions on the pending motions.

On May 14, 2002, the Burrells filed the present action in the United States District Court for the District of New Mexico.[4] The complaint alleged that exhaustion of tribal

_____

[3] The tribal court complaint is essentially the same complaint filed in the Burrells' first federal action. The tribal court complaint contained civil rights claims under 42 U.S.C. §§ 1981, 1983, and 1985, and claims for breach of lease, respondeat superior, negligence, and violations of property rights and "tribal laws and tradition." App. at 254-73.

[4] The Burrells acknowledge that the complaint in this action is basically the same complaint filed in the first federal action and in the tribal court. App. at 21, 189. In fact, the Burrells state that the two federal proceedings and the tribal court proceeding "involve the same parties, the same issues of fact and law, and are actually the same case." Id. at

court remedies should not be required because Judge Kezele denied the Burrells due process of law by failing to make any rulings on the pending motions for almost four years. App. at 22-23. The complaint also asserted that Judge Kezele's conduct "exhibited extreme bias in favor of the Pueblo of Santa Ana and [the] tribal officials" who paid his salary. Id.

The Pueblo and the individual tribal officials subsequently filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and (b)(6). In this motion, they asserted that the Burrells' complaint should be dismissed for failure to state a claim and for failure to exhaust tribal court remedies, and that the action against the Pueblo was barred by tribal sovereign immunity. App. at 29, 57. The district court granted the motion on the exhaustion of remedies ground. Id. at 158-65. The district court stated that at some point a delay in tribal court proceedings might be sufficient to invoke an exception to the exhaustion requirement, but given the appointment of a new tribal judge to the Burrells' case, the district court concluded that the tribal court remained an available forum for the Burrells to exhaust their remedies. Id. at 163-64. Thus, the district court stayed the case for six months to provide the tribal court an opportunity to address the Burrells' claims. Id. at 164. The district court declined to address tribal sovereign immunity until the issue of exhaustion had been resolved. Id.

Within that six month period, Tribal Court Judge Angela Luhan issued an "Order Granting Defendant's [sic] Motion to Dismiss on Grounds of Sovereign Immunity." App. 189.

at 168. The order stated in its entirety:

> THIS MATTER comes before the Court pursuant to Defendant's [sic] Motion to Dismiss [o]n Grounds of Sovereign Immunity. Having reviewed the entire file in this matter, submissions of the parties, applicable law, and being otherwise fully advised on the issues, THE COURT FINDS that Santa Ana Tribal Court has Jurisdiction to hear this matter, and Defendant's [sic] motion is well taken and granted, and there is no need for any further hearings in this matter.
>
> IT IS THEREFORE ORDERED that Defendant's [sic] Motion to Dismiss is hereby GRANTED on the grounds that Plaintiff's [sic] claims are barred by the Sovereign Immunity of Defendant, Pueblo of Santa Ana, from suit.

Id. Judge Luhan did not issue a ruling on any other motions.[5]

After the Pueblo and the individual tribal officials notified the district court of the tribal court's decision, the Burrells filed a motion asking the district court to declare the tribal court's decision "null and void." App. at 169, 188. The district court denied the motion, refusing to review the Burrells' arguments that the tribal court failed to order the parties to arbitration and that the tribal court's sovereign immunity ruling was contrary to Supreme Court precedent. Id. at 194-201. The district court stated that it could only review the tribal court's determination regarding its jurisdiction to adjudicate the Burrells' claims, but that nothing in the Burrells' motion could be construed as such a request. Yet, the district court entertained the Burrells' argument to declare the tribal court's decision void based on a lack of due process. Id. at 197. Although the district

---

[5] In additional to their prior pending motions before Judge Kezele, the Burrells also filed several motions before Judge Luhan, including motions to compel discovery, amend their complaint, and order arbitration. App. at 220.

court initially determined that its readjudication of issues previously resolved by a tribal court was not supported by Supreme Court precedent, it alternatively reached the merits of the Burrells' due process argument and found that the tribal court's proceedings provided adequate due process. Id. at 198. The district court concluded its ruling by requesting the parties to file status briefs addressing, at a minimum, the following issues: whether the stay should be lifted; whether the stay should be extended pending further exhaustion; and whether the Burrells' claims should be dismissed. Id. at 193-94, 201.

In the status briefs filed, the parties agreed that the Burrells had fully exhausted their tribal court remedies because it appeared that no appellate review was available. App. at 204, 220-21. The Pueblo and the individual tribal officials also maintained in their status briefs that the district court should lift the stay and dismiss the Burrells' complaint with prejudice under *res judicata* principles, arguing that the tribal court fully adjudicated the Burrells' claims. Id. at 203-14.

The district court subsequently lifted the stay because the parties did not dispute that the Burrells exhausted their tribal court remedies. App. at 398. The district court also construed the Pueblo and the individual tribal officials' status brief as a second motion to dismiss raising *res judicata* as a new ground for dismissal, and provided the Burrells an opportunity to respond. Id. at 400. The Burrells, however, did not file a response.

On August 29, 2003, the district court issued a decision on the unopposed second motion to dismiss. App. at 402-406. The district court noted that under Fed. R. Civ. P.

-11-

41(b) and Tenth Circuit precedent, a dismissal for lack of jurisdiction (such as sovereign immunity) did not operate as a final adjudication on the merits under *res judicata* principles. Id. at 404. Nevertheless, the district court stated that under the doctrine of collateral estoppel, a dismissal for lack of jurisdiction precluded "relitigation of the jurisdictional issues necessarily decided on the jurisdictional question." Id. at 405 (citing Matosantos Commercial Corp. v. Applebee's Int'l, Inc., 245 F.3d 1203, 1209-10 (10th Cir. 2001); Stewart Sec. Corp. v. Guar. Trust Co., 597 F.2d 240, 241 (10th Cir. 1979)).

Applying this law, the district court concluded that the tribal court "necessarily determined that the Defendants were entitled to sovereign immunity with regard to all claims and that immunity had not been waived." App. at 405. As a result, the district court held that the tribal court's decision was entitled to preclusive effect. Id. The district court noted, as it did previously in the case, that it possessed the authority to consider whether the tribal court had jurisdiction to decide the Burrells' claims. The district court then commented:

> Plaintiffs have never made an intelligible argument challenging the jurisdiction of the Santa Ana Tribal Court over their various claims. Plaintiffs . . . [previously argued] that the tribal court lacked jurisdiction over the BIA lease because of an alleged arbitration clause within the lease and lacked jurisdiction over all Plaintiffs' claims because tribal courts are generally unfair. These arguments do not relate to the jurisdictional authority of the Santa Ana Tribal Court over Plaintiffs' causes of action. Plaintiffs made no further attempt to challenge the jurisdiction of the tribal court. Therefore, this Court has never addressed the jurisdiction of the Santa Ana Tribal Court as it relates to Plaintiffs' claims.

Id. at 405-06.

-12-

III. STANDARD OF REVIEW

The Burrells' notice of appeal references only the district court's August 29, 2003, order dismissing their claims based on the preclusive effect accorded to the tribal court's sovereign immunity decision. App. at 408; see Salguero v. City of Clovis, 366 F.3d 1168, 1172 (10th Cir. 2004) (citation omitted) (reviewing the district court's application of the doctrine of collateral estoppel de novo). The Burrells' appellate brief, however, does not limit itself to challenging the district court's collateral estoppel ruling. Rather, the Burrells spend a significant portion of their brief arguing that the district court erred by denying their motion to declare the tribal court's decision "null and void." They focus, in particular, on the alleged lack of due process afforded to them during the tribal court proceedings. We believe that the issues involved in the denial of that motion–whether, and under what circumstances, a federal court may refuse to recognize or enforce a tribal judgment–are intertwined and arguably inseparable from the question of whether to give the tribal court's judgment preclusive effect. Therefore, we also review de novo the district court's denial of the Burrells' motion to declare the tribal court's decision "null and void." See Bird v. Glacier Elec. Coop. Inc., 255 F.3d 1126, 1140-41 (9th Cir. 2001) (applying de novo review to examine whether "alleged due process violations precluded the district court's grant of comity . . . to the tribal court judgment").

IV. DISCUSSION

The threshold issue on appeal is whether any grounds exist that would prevent us

from giving preclusive effect or otherwise recognizing the tribal court's sovereign immunity decision. We believe two grounds require consideration in this case: (1) lack of subject matter jurisdiction; and (2) denial of due process, including whether the Burrells enjoyed a "full and fair opportunity to litigate" their claims under the doctrine of collateral estoppel. See Macarthur v. San Juan County, 309 F.3d 1216, 1225 (10th Cir. 2002) (stating that this court is "unwilling to enforce judgments of tribal courts acting beyond their authority"); Wilson v. Marchington, 127 F.3d 805, 807 (9th Cir. 1997) (cited with approval in Macarthur) (holding that federal courts shall neither recognize nor enforce tribal judgments if "(1) the tribal court did not have both personal and subject matter jurisdiction; or (2) the defendant was not afforded due process of law"); Ryan v. City of Shawnee, 13 F.3d 345, 348 n.2 (10th Cir. 1993) (noting that "'[c]ollateral estoppel cannot apply when the party against whom the earlier decision is asserted did not have a "full and fair opportunity" to litigate that issue in the earlier case'") (internal citation omitted).

*A. Tribal Court Jurisdiction*

"Tribal courts have repeatedly been recognized as appropriate forums for the exclusive adjudication of disputes affecting important personal and property interests of both Indians and non-Indians." Santa Clara Pueblo v. Martinez, 436 U.S. 49, 65-66 (1978) (internal citations omitted); see Montana v. United States, 450 U.S. 544, 566 (1981) (determining that Indian tribes possess inherent authority to exercise civil jurisdiction over "nonmembers who enter consensual relationships with the tribe or its

-14-

members, through . . . contracts, leases, or other arrangements" and "over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe"); Enlow v. Moore, 134 F.3d 993, 996 (10th Cir. 1998) (stating that "civil jurisdiction over non-Indians on reservation lands 'presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or federal statute'") (citation omitted).

The Supreme Court, citing the promotion of tribal self-government and principles of comity (as opposed to a jurisdictional prerequisite), has required litigants to exhaust their tribal court remedies before a district court may evaluate the existence of a tribal court's jurisdiction. Iowa Mut., 480 U.S. at 15-16; see Texaco, Inc. v. Zah, 5 F.3d 1374, 1378 (10th Cir. 1993) (noting that "[w]hen the activity at issue arises on the reservation, [exhaustion] policies almost always dictate that the parties exhaust their tribal remedies before resorting to a federal forum"); Smith v. Moffett, 947 F.2d 442, 444 (10th Cir. 1991) (stating that application of the exhaustion requirement does not depend on the existence of a pending action in a tribal court). This exhaustion policy provides a tribal court the first opportunity to examine its own jurisdiction, but is subject to the following exceptions: (1) "where an assertion of tribal jurisdiction 'is motivated by a desire to harass or is conducted in bad faith,'" Nat'l Farmers, 471 U.S. at 857 n.21 (internal citation omitted); (2) "where the [tribal court] action is patently violative of express jurisdictional prohibitions," id.; (3) "where exhaustion would be futile because of the lack

-15-

of an adequate opportunity to challenge the [tribal] court's jurisdiction," id.; (4) "[w]hen .

. . it is plain that no federal grant provides for tribal governance of nonmembers' conduct

on land covered by [the main rule established in Montana v. United States]," Strate v. A-1

Contrs., 520 U.S. 438, 459 n.14 (1997); or (5) it is otherwise clear that the tribal court

lacks jurisdiction so that the exhaustion requirement "'would serve no purpose other than

delay,'" Nevada v. Hicks, 533 U.S. 353, 369 (2001) (internal citation omitted).

Allegations of local bias and tribal court incompetence, however, are not exceptions to

the exhaustion requirement.  Iowa Mut., 480 U.S. at 19.

After exhaustion is completed, litigants may seek federal court review of a tribal

court's ruling that it had jurisdiction.  Iowa Mut., 480 U.S. at 19; Nat'l Farmers, 471 U.S.

at 853.  But "[u]nless the district court finds the tribal court lacked jurisdiction or

withholds comity for some other valid reason, it must enforce the tribal court judgment

without reconsidering issues decided by the tribal court."  AT&T Corp. v. Coeur D'Alene

Tribe, 295 F.3d  899, 905 (9th Cir. 2002) (citing Iowa Mut., 480 U.S. at 19).

The Burrells never accepted the district court's invitation to challenge the tribal

court's jurisdiction.  On appeal, the Burrells still fail to construct a clear argument

challenging the tribal court's jurisdiction over their claims.  The only argument in the

Burrells' filings before the district court or on appeal that could be construed as an

objection to the tribal court's jurisdictional authority is their claim that the provisions of

the BIA lease required arbitration of their damage claims before the Secretary of Interior.[6]

With regard to their contention that the BIA lease required arbitration of their damage claims, the Burrells argue that language in the BIA lease and its reference to 25 C.F.R. § 131, together with 25 U.S.C. § 229, operate as a waiver of the Pueblo's sovereign immunity and require arbitration of their damage claims by the Secretary of the Interior. Aplt. Br. at 23-25, 30. In support, the Burrells cite the Supreme Court's decision in C & L Enterprises, Incorporated v. Citizen Bank Potawatomi Indian Tribe of Oklahoma, 532 U.S. 411, 414 (2001), which held that an Indian tribe's agreement to arbitrate disputes and to enforce arbitral awards in state court waived the tribe's sovereign immunity in a state court action to enforce an arbitral award. We conclude that the Burrells fail to demonstrate that an agreement to arbitrate existed or that any applicable federal law required arbitration in this instance.

First, the Burrells claim that the BIA lease contains a provision requiring arbitration before the Secretary of the Interior pursuant to "the old" 25 C.F.R. § 131. While the lease references that regulation, App. at 123, the portions of that regulation

_____

[6]

The record reflects that the Burrells addressed the tribal court's jurisdiction to adjudicate civil rights claims in their first federal case. Nevertheless, they failed to squarely raise the issue in this case. Instead, they have merely suggested that the district court erred in the first case they filed by requiring them to exhaust their tribal remedies. In support of that contention, they note that their case involves a federal lease and constitutional torts. Noticeably absent from the Burrells' briefs is citation to the Supreme Court's decision in Nevada v. Hicks, which held that "tribal courts cannot entertain § 1983 suits." 533 U.S. at 369. Whether tribal courts possess jurisdiction to adjudicate § 1981 and § 1985 claims appear to be issues of first impression. But since the Burrells have not raised these issues, we will not address them at this time.

cited by the Burrells in their appellate brief do not even mention arbitration. Further, we observe that the Pueblo and the individual tribal officials pointed out to the district court that 25 C.F.R. § 131 has been repealed, that 25 C.F.R. § 162 now deals with Indian leases, and that 25 C.F.R. § 162 does not contain a provision requiring arbitration. Id. at 178. Even in the Burrells' first federal action, the district court rejected the Burrells' claim that 25 C.F.R. § 131 was a jurisdictional prohibition to tribal court authority. Id. at 250.

Second, the Burrells cite paragraph seven of the lease, entitled "Reservations," which states:

> It is understood and agreed that the lessor reserves the right to make oil and gas leases, grant rights of way and other legal grants, on the premises covered by this lease and that in event such a lease or grant is made, the lessee hereunder shall be entitled to damages for the actual loss sustained by him on account of said lease or grant, and to nothing more. It is further understood that *in the event of a dispute between the lessee hereunder and the lessee or permittee under any oil and gas lease, right-of-way, or other grant, as to the amount of such actual damages the matter will be referred to the Secretary who shall be the sole and final judge as to the amount of the said damages.*

App. at 124 (emphasis added). This paragraph, however, relates to disputes between the Burrells and lessees under an oil and gas lease, right-of-way, or other grant–not disputes between the Burrells and the Pueblo. App. Br. at 17.

Third, the Burrells rely on 25 U.S.C. § 229, which states:

> If any Indian, belonging to any tribe in amity with the United States, shall, within the Indian country, take or destroy the property of any person lawfully within such country, or shall pass from Indian country into any State or Territory inhabited by citizens of the United States, and there take,

-18-

steal, or destroy, any horse, or other property belonging to any citizen or inhabitant of the United States, such citizen or inhabitant, his representative, attorney, or agent, may make application to the proper superintendent, agent, or subagent, who, upon being furnished with the necessary documents and proofs, shall, under the direction of the President, make application to the nation or tribe to which such Indian shall belong, for satisfaction; and if such nation or tribe shall neglect or refuse to make satisfaction, in a reasonable time not exceeding twelve months, such superintendent, agent, or subagent shall make return of his doings to the Commissioner of Indian Affairs, that such further steps may be taken as shall be proper, in the opinion of the President, to obtain satisfaction for the injury.

25 U.S.C. § 229. This argument was not presented to the district court, and it is well-settled that this court generally does not review matters raised for the first time on appeal. See, e.g., Tillman ex rel. Estate of Tillman v. Camelot Music, Inc., 408 F.3d 1300, 1307 (10th Cir. 2005). In any event, this statute does not establish that the Pueblo waived its sovereign immunity by agreeing to arbitrate disputes over the BIA lease, thereby depriving the tribal court of jurisdiction.

Lastly, the Burrells point out that they wrote to the Area Director of the BIA on June 22, 1998, demanding all their rights under the lease. The Burrells claim that this general demand encompassed a request for mandatory arbitration. This argument incorrectly assumes that the BIA lease contained a right to arbitration. Even if the Burrells could somehow argue that the Secretary of Interior failed to afford them arbitration, they waived this argument because they never sought federal review of the IBIA's decision to terminate the lease.

In sum, while lack of subject matter jurisdiction is a ground for refusing to

recognize the tribal court's sovereign immunity decision, we agree with the district court that the Burrells failed to assert an intelligible or otherwise meritorious argument on this issue.

*B. Collateral Estoppel-Due Process Considerations*

The Burrells focus most of their attention on an alleged lack of fairness during the proceedings before the tribal court. The Burrells maintain that the tribal court refused to allow discovery pertaining to the tribal council's records of its meetings; the Pueblo's form of government, including the separation of powers between the tribal council, tribal officials, and the cacique that appoints them;[7] the tribal court's code of laws; and the existence of a tribal court system based on principles of *stare decisis*. Aplt. Br. at 19. The Burrells assert that the Pueblo has a corrupt, totalitarian form of government that lacks a regular code of laws and allows tribal judges to serve entirely at the whim of tribal officials. The Burrells point out that the first tribal judge failed to make any rulings for almost four years, and they assert that the second tribal judge acted upon an incomplete record,[8] ignored their motions, and simply issued a one-page order dismissing their case on sovereign immunity grounds. Finally, the Burrells argue that they were entitled to

---

[7]

The cacique appears to be the leader of the Pueblo that is appointed for life.

[8]

The Burrells presume that no transcripts of the two days of hearings exist because the first tribal judge ignored requests for copies of the tapes from the hearings. Aplt. Br. at 22.

basic due process rights, including rights to a fair hearing and an impartial tribal judge.[9]

They believe that the district court had a responsibility to review the tribal court's

handling of their case because it involves a dispute over a federal lease and alleged

violations of civil rights.

In denying the Burrells' motion to declare the tribal court decision "null and void,"

the district court observed that the Ninth Circuit, following principles of comity utilized

for recognition of foreign judgments, refuses to enforce tribal court judgments if the tribal

court denied a litigant due process. App. at 197 (citing AT&T Corp., 295 F.3d 899; Bird,

255 F.3d 1136). The district court, however, ruled that a federal court's authority to

readjudicate issues resolved in tribal court because of a due process failure was contrary

to the Supreme Court's decisions in Iowa Mutual and National Farmers. Id. at 198. In

the alternative, the district court reached the merits of the Burrells' argument and ruled

that they were afforded sufficient due process. Id. The district court noted that the tribal

court provided the Burrells two days of hearings, and stated that they were not deprived

of due process merely because the tribal court ruled on sovereign immunity without

ruling on the Burrells' pending motions. Id.

We disagree with the district court's conclusion that the Burrells could not

---

[9]     We note that at one point in their brief, the Burrells ask us to overrule the Supreme
Court's decision in Santa Clara Pueblo v. Martinez. The Burrells maintain that Martinez
subjects United States citizens to "wide ranging violations of their basic constitutional rights
by tribal officials." In Martinez, the Supreme Court limited federal relief under Title I of the
Indian Civil Rights Act of 1968 ("ICRA"), 25 U.S.C. §§ 1301-1303, to a writ of habeas
corpus. 436 U.S. at 69-70. Needless to say, we cannot overrule the Supreme Court.

challenge the tribal court's judgment based on due process considerations. The Supreme

Court's decisions in Iowa Mutual and National Farmers do not address due process;

rather, they hold that principles of comity require a federal court to give a tribal court the

first opportunity to determine its own jurisdiction, subject to later review by a federal

court. Iowa Mut., 480 U.S. at 19; National Farmers, 471 U.S. at 857. Here, we conclude

that both principles of comity applicable to the recognition of foreign judgments, and the

collateral estoppel doctrine's requirement that a litigant have a full and fair opportunity to

litigate an issue, are relevant to the case at hand.

In Macarthur v. San Juan County, we cited the Ninth Circuit's decision in Wilson

v. Marchington, which found two mandatory grounds for refusing to recognize and

enforce a tribal court judgment. Macarthur, 309 F.3d at 1225. Specifically, the Ninth

Circuit held, citing principles of comity, that a federal court should neither recognize nor

enforce a tribal judgment if the tribal court lacked personal or subject matter jurisdiction,

or if the defendant was denied due process of law. Marchington, 127 F.3d at 810. We

still find Marchington instructive.

As to the due process ground, the Ninth Circuit determined that due process

encompassed

> that there has been opportunity for a full and fair trial before an impartial
> tribunal that conducts the trial upon regular proceedings after proper service
> or voluntary appearance of the defendant, and that there is no showing of
> prejudice in the tribal court or in the system of governing laws. Further, . . .
> evidence "that the judiciary was dominated by the political branches of
> government or by an opposing litigant, or that a party was unable to obtain
> counsel, or secure documents or attendance of witnesses, or to have access

> to appeal or review, would support a conclusion that the legal system was one whose judgments are not entitled to recognition."

Id. at 811 (citing Hilton v. Guyot, 159 U.S. 113, 202-03 (1895); Restatement (Third) of Foreign Relations Law of the United States § 482 & cmt. b (1986)); see also Bird, 255 F.3d at 1152 (applying Marchington to hold that a closing argument in tribal court offended due process). While describing these basic due process tenets, the Ninth Circuit cautioned that comity did not require "a tribe [to] utilize judicial procedures identical to those used in the United States Courts" and that federal courts should "be careful to respect tribal jurisprudence along with the special customs and practical limitations of tribal court systems." Id.

Additionally, we observe that our collateral estoppel jurisprudence is consistent with the notion that due process concerns are relevant in assessing whether to recognize a tribal court judgment. See Crocog Co. v. Reeves, 992 F.2d 267, 270 (10th Cir. 1993) (stating that due process requires that a party have a full and fair opportunity to litigate its case) (citing Kremer v. Chem. Constr. Corp., 456 U.S. 461, 482-83 & n.24 (1982)).

Collateral estoppel, or, as it is often known, issue preclusion, "bars a party from relitigating an issue once it has suffered an adverse determination on the issue, even if the issue arises when the party is pursuing or defending against a different claim." Park Lake Res., Ltd. Liab. Co. v. U.S. Dep't of Agric., 378 F.3d 1132, 1136 (10th Cir. 2004). In this circuit, application of issue preclusion requires four elements:

> (1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been finally adjudicated on the

-23-

merits, (3) the party against whom the doctrine is invoked was a party, or in privity with a party, to the prior adjudication, and (4) *the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action*.

Dodge v. Cotter Corp., 203 F.3d 1190, 1198 (10th Cir. 2000) (citation omitted) (emphasis added).[10]

As to the "'inquiry into whether a party had a full and fair opportunity to litigate an issue . . . [we] focus on whether there were significant procedural limitations in the prior proceeding, whether the party had the incentive to litigate fully the issue, or whether effective litigation was limited by the nature or relationship of the parties.'" Murdock v. UTE Indian Tribe of Uintah & Ouray Reservation, 975 F.2d 683, 689 (10th Cir. 1992) (internal citation omitted); see also Bell v. Dillard Dep't Stores, 85 F.3d 1451, 1456 (10th Cir. 1996) (listing several authorities for the proposition that a lack of opportunity to appeal may weigh against finding that a party had a full and fair opportunity to litigate an issue).

Under the circumstances present in this case, we conclude that both principles of

_____

[10]

Elements one and three are clearly satisfied in this case. Element two is also satisfied because a dismissal for lack of jurisdiction, such as sovereign immunity, is an exception to the final adjudication on the merits requirement. See Park Lake, 378 F.3d at 1136 (internal citations and quotations omitted) (stating that, although a dismissal on jurisdictional grounds is not a final adjudication on the merits, "dismissals for lack of jurisdiction preclude relitigation of the issues determined in ruling on the jurisdiction question").

comity and the full and fair opportunity to litigate element of the collateral estoppel doctrine weigh against recognizing the tribal court's sovereign immunity decision. As an initial matter, we note that the close relationship between the tribal court, the Pueblo, and the individual tribal officials causes us to carefully scrutinize the tribal court proceedings in this case.

First, the procedural posture leading up to the tribal court's ruling gives this court pause. Although the first tribal judge conducted two days of evidentiary hearings, he failed to make any rulings on the parties' pending motions after four years. This provides some evidence that the Burrells did not have a forum to fully and fairly litigate their claims. Further, when the Burrells returned to the tribal court, they encountered a new tribal judge who had not presided over the two days of hearings. Whether the new judge had reviewed or had any knowledge of the testimony from those hearings is unclear, but the record reflects that the first tribal judge never responded to the parties' request for a transcript of the proceedings. Without any further hearings or ruling on any other pending motions, the second tribal judge issued a one-page order granting the Pueblo sovereign immunity (and presumably extending the Pueblo's immunity to the individual tribal officials), and dismissed the Burrells' claims. This one-page order contained no reference to any testimony from the evidentiary hearing, or for that matter any explanation of the tribal court's reasoning.

Second, we are troubled by the lack of a tribal appellate court to review the second tribal judge's decision. At one point in the litigation, counsel for the Pueblo and

individual tribal officials suggested that exhaustion would not be complete until the Burrells pursued an appeal before the tribal council, presided over by the governor. App. at 204. Counsel later corrected that statement, noting that when the tribal council created the "Contemporary Tribal Court," it did not provide for any appeal to the tribal council. Id. Not only do counsel's statements demonstrate the unavailability of any appellate review, they shed light on the nature of the relationship between the tribal court and the named defendants in this action.

In reaching our decision, we emphasize that federal courts are not the general appellate body for tribal courts. As the Supreme Court has instructed, the federal policies promoting tribal self-government and self-determination instruct us to provide great deference to tribal court systems, their practices, and procedures. See, e.g., Nat'l Farmers, 471 U.S. at 856. This heed we do not take lightly. Moreover, we firmly reject the Burrells' position that the district court had a duty to monitor the proceedings before the tribal court.

Given our conclusion that the tribal court's decision is not entitled to recognition under either principles of comity or collateral estoppel, we proceed to address the merits of the sovereign immunity issue.

*C. Sovereign Immunity for the Pueblo*

"As a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity." Kiowa Tribe of Okla. v. Mfg. Techs., Inc., 523 U.S. 751, 754 (1998). Congress's intent to abrogate a tribe's

immunity must be unequivocally expressed, while a tribe's waiver of its immunity must be clear. C&L Enters., Inc., 532 U.S. at 418.

Again, the only argument that the Burrells raise to challenge the Pueblo's sovereign immunity is that the provisions of the BIA lease required arbitration of their damage claims before the Secretary of the Interior.[11] Having already determined that this argument is without merit, we conclude that the Pueblo is entitled to sovereign immunity.

D. *Claims Against the Individual Tribal Officials*

An Indian tribe's "sovereign immunity does not extend to an official when the official is acting as an individual or outside the scope of those powers that have been delegated to him." Tenneco Oil Co. v. Sac & Fox Tribe of Indians, 725 F.2d 572, 576 n.1 (10th Cir. 1984) (McKay, J., concurring). Thus, "[w]hen a complaint alleges that the named officer defendants have acted outside the amount of authority that the sovereign is capable of bestowing, an exception to the doctrine of sovereign immunity is invoked." Id. at 574; see also Burlington N. R. Co. v. Blackfeet Tribe, 924 F.2d 899, 902 (9th Cir. 1991) (stating that a tribe's immunity extends to officials "acting in their representative capacity and within the scope of their valid authority").

Accepting the allegations in the Burrells' complaint as true, we conclude that they have sufficiently pled that the individual tribal officials acted outside of their official authority, and thus, are not entitled to sovereign immunity. The question then remains

---

[11]

The Burrells do not argue that Congress waived tribal sovereign immunity for their civil rights claims, and therefore, we do not reach those questions.

whether the Burrells' complaint states a claim for relief pursuant to 42 U.S.C. §§ 1981, 1983, or 1985, or for breach of the lease.

Both parties have briefed the merits of the Burrells' claims under Fed. R. Civ. P. 12(b)(6). At this juncture, the Burrells' § 1983 and breach of lease claims may be disposed of quickly. First, the Burrells' complaint alleges that the individual tribal officials acted under color of tribal law, as opposed to state law. See App. at 8 ("The conduct and omissions of the Defendants complained of were committed by persons acting under color of tribal law."); App. at 17 ("These defendant tribal officials were clothed under tribal authority at all times . . . ."). A § 1983 action is unavailable "for persons alleging deprivation of constitutional rights under color of tribal law." R.J. Williams Co. v. Ft. Belknap Hous. Auth., 719 F.2d 979, 982 (9th Cir. 1983).

We also dismiss the Burrells' breach of lease claim. The IBIA terminated the lease in May 2000, despite the Burrells' allegations that discrimination from the Pueblo and its officials amounted to a constructive termination and breach of the lease. The Burrells' failure to seek review of the IBIA's final decision prevents them from asserting a breach of lease claim here. See, e.g., McAlpine v. United States, 112 F.3d 1429, 1430 (10th Cir. 1997) (reviewing an IBIA decision under the Administrative Procedure Act, 5 U.S.C. §§ 551-706).

Lastly, we express no opinion as to the merits of the Burrells' § 1981 and § 1985 claims against the individual tribal officials. Instead, we remand those claims to the district court for consideration in the first instance.

-28-

Accordingly, we REVERSE the district court's decision to give preclusive effect to the tribal court's ruling and its subsequent dismissal of the Burrells' claims on that basis. However, we DISMISS the Pueblo from this action because it is entitled to sovereign immunity, and DISMISS the Burrells' § 1983 and breach of lease claims against the individual tribal officials for failure to state a claim. Finally, we REMAND the Burrells' § 1981 and § 1985 claims against the individual tribal officials for the district court to address in the first instance. We express no opinion on the merits of these remaining claims.

*Burrell v. Armijo*, 03-2223

**McCONNELL**, Circuit Judge, concurring in the judgment.

_____

I agree with the majority that the district court improperly gave preclusive effect to the tribal court's judgment. I would reach this conclusion, however, on a much narrower ground. Instead of deciding that the court system of the Santa Ana Pueblo fails to provide a full and fair opportunity to litigate, I would reverse on the ground that the tribal court lacked jurisdiction to hear federal civil rights claims brought under 42 U.S.C. § 1981 and § 1985. We may consider the jurisdiction of the tribal court *sua sponte*, and in this case we have strong reasons to do so.

This case is essentially a civil rights action under 42 U.S.C. §§ 1981 and 1985. In *Nevada v. Hicks*, 533 U.S. 353, 366-69 (2001), the Supreme Court established that a tribal court cannot entertain claims under 42 U.S.C. § 1983, and I see no reason to distinguish the § 1983 claim in *Hicks* from the Burrells' § 1981 and § 1985 claims. (Counsel for the Pueblo essentially conceded as much at oral argument.) It follows that the tribal court was not a "court of competent jurisdiction," and its ruling is therefore entitled neither to deference nor to preclusive effect. *See Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 19 (1987) ("Unless a federal court determines that the Tribal Court lacked jurisdiction, however, proper deference to the tribal court system precludes relitigation of issues raised by the LaPlantes' bad-faith claim and resolved in the Tribal Courts."); *Montana v. United States*, 440 U.S. 147, 153 (1979) (noting that collateral estoppel requires a decision by a "court of competent jurisdiction"); *Hilton v. Guyot*, 159 U.S. 113, 202-03 (1895)

(requiring the same for comity). As the majority notes, the Burrells challenged the jurisdiction of the tribal court in their first federal suit but have not "squarely raise[d] the issue in this case." Op. of Briscoe, J., at 17 n.6. Two questions remain: whether we may raise the jurisdiction of the tribal court *sua sponte*, and whether we should.

There is no controlling precedent on raising the jurisdiction of the tribal court *sua sponte*, but the best conclusion is that we may do so. As a general matter, this Court disfavors enforcing judgments of tribal courts that act without jurisdiction. *MacArthur v. San Juan County*, 309 F.3d 1216, 1225 (10th Cir. 2002) ("We are unwilling to enforce judgments of tribal courts acting beyond their authority, especially where defendants have a federal right 'to be protected against an unlawful exercise of Tribal Court judicial power.'" (quoting *Nat'l Farmers Union Ins. Cos. v. Crow Tribe*, 471 U.S. 845, 851 (1985)); *see also Wilson v. Marchington*, 127 F.3d 805, 811 (9th Cir. 1997) (considering it not "discretionary" but rather "a threshold inquiry" whether the tribal court had subject-matter jurisdiction).

This Court has not yet decided whether a tribal court's judgment is entitled to preclusive effect under the Full Faith and Credit Clause, U.S. Const. art. IV, §1; 28 U.S.C. § 1738, or as a matter of comity. *MacArthur*, 309 F.3d at 1225; *cf. Marchington*, 127 F.3d at 807 (concluding "that the principles of comity, not full faith and credit, govern whether a district court should recognize and enforce a tribal court judgment"). The majority uses both approaches. Either way, it is appropriate for a federal court to consider whether the court that rendered the underlying judgment had jurisdiction to do

-2-

so.

It is well established that a court may raise the issue of preclusion on its own motion, in appropriate cases. *Arizona v. California*, 530 U.S. 392, 412 (2000) (allowing that res judicata might be raised *sua sponte* in "special circumstances"); *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 230 (1995) (noting "that trial courts may in appropriate cases raise the res judicata bar on their own motion"); *Scherer v. Equitable Life Assurance Soc'y*, 347 F.3d 394, 398 n.4 (2d Cir. 2002) (noting that "a court is free to raise [res judicata] *sua sponte*, even if the parties have seemingly waived it," but also noting that a court has "no obligation to" and may even have good reasons not to raise it); *Mowbray v. Cameron County, Texas*, 274 F.3d 269, 281-82 (5th Cir. 2001) (upholding a district court's dismissal *sua sponte* on res judicata grounds); *see also* Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, 18 *Federal Practice and Procedure* § 4405 (2d ed. 1990 & Supp. 2005) ("[I]t has become increasingly common to raise the question of preclusion on the court's own motion.").

It would seem to follow that a court may consider preclusion *sua sponte* to *retain* federal jurisdiction. Without a discretionary power to raise a tribal court's jurisdiction *sua sponte*, the federal court could be in the awkward position of acceding to the judgment of a court that self-evidently lacked jurisdiction. Justice requires not only recognizing the judgments of courts of competent jurisdiction but also refusing to recognize a judgment that manifestly lacks legal validity.

If we are dealing here with comity, rather than res judicata or collateral estoppel,

the argument is even stronger. "[I]nquiry into jurisdiction is a part of comity analysis," *John v. Baker*, 30 P.3d 68, 72 n.14 (Alaska 2001), and a court "need not recognize a judgment of the court of a foreign state if . . . the court that rendered the judgment did not have jurisdiction of the subject matter of the action." *Restatement (Third) of Foreign Relations Law* § 482(2)(a) (1987) (including case citations to comity analysis of tribal-court judgments). Put simply, lack of jurisdiction in a foreign court is a "universally accepted ground for refusing to recognize or enforce the judgment of a foreign state." *Recognition and Enforcement of Foreign Judgments: Analysis and Proposed Federal Statute* § 6 cmt. a (Apr. 11, 2005).

Venerable decisions of the Supreme Court suggest that a court may always consider the jurisdiction of a foreign court in cases where a party seeks recognition of the foreign judgment as a matter of comity. *See Thompson v. Whitman*, 85 U.S. (18 Wall.) 457, 461 (1873) ("[A]s to a foreign judgment it is perfectly well settled that the inquiry is always open, whether the court by which it was rendered had jurisdiction of the person or the thing."); *Rose v. Himely*, 8 U.S. (4 Cranch) 241, 268-69 (1808) (Marshall, C.J.) (concluding that as a matter of principle the personal and subject-matter jurisdiction of a foreign court "may be considered by that tribunal which is to decide on the effect of the sentence").

The Ninth Circuit has gone so far as to hold that federal courts have an obligation to determine whether the tribal court had jurisdiction before according its judgment preclusive effect as a matter of comity. *Marchington*, 127 F.3d at 810-11 ("[F]ederal

-4-

courts must neither recognize nor enforce tribal judgments if . . . the tribal court did not have both personal and subject matter jurisdiction.").  Whether such an inquiry is mandatory or discretionary, however, *sua sponte* consideration appears to be the accepted practice:

> Generally the courts feel free to examine the factual basis of jurisdiction under foreign law without considering whether the jurisdictional question was litigated in the foreign court, or whether it could be raised in a collateral attack on the judgment in the foreign country.  Usually no reason is assigned for such reexamination of the foreign court's jurisdiction.

Robert B. von Mehren and Michael E. Patterson, *Recognition and Enforcement of Foreign-Country Judgments in the United States*, in *Enforcement of Foreign Country Judgments* 15, 33 (Robert B. von Mehren ed., 1974); *see also Conflicts of Law, Foreign Judgments, Basis of Jurisdiction of Foreign Court Determined by Forum's Concepts*, 34 Va. L. Rev. 956, 957 (1948) ("[W]ant of jurisdiction of the court over the parties or the subject matter will always negative the validity of the judgment.").  Therefore, under a comity analysis, we at least *may* consider *sua sponte* whether the tribal court had subject-matter jurisdiction.

Whether the inquiry is preclusion or comity, we have strong prudential reasons to address the jurisdiction of the tribal court in this case.  First, the tribal court's jurisdiction to hear cases under § 1981 and § 1985 is a purely legal question, requiring no factual development.  *See Russell v. SunAmerica Sec., Inc.*, 962 F.2d 1169, 1172 (5th Cir. 1992) (considering res judicata on the court's own motion because, "where all of the relevant facts are contained in the record before us and all are uncontroverted, [a court] may not

ignore their legal effect, nor may [it] decline to consider the application of controlling rules of law to the dispositive facts, simply because neither party has seen fit to invite [its] attention to the issue by technically correct and exact pleadings").

Second, after *Hicks*, the answer is clear. *Hicks* held unequivocally that a tribal court cannot entertain claims under 42 U.S.C. § 1983. Although application of *Hicks* to claims brought under § 1981 and § 1985 is technically a question of first impression for our Circuit, there is no reason to distinguish one section of the Reconstruction-era civil rights laws from the others. The *Hicks* Court reasoned that tribal courts are not courts of general jurisdiction with respect to nonmembers, 533 U.S. at 367, and "no provision in federal law provides for tribal-court jurisdiction over §1983 actions." *Id*. at 368. The same is true of § 1981 and § 1985.

Third, and most important, reliance on jurisdictional grounds—unlike due process—does not impugn the tribal courts. *Cf. Hilton v. Guyot*, 159 U.S. 113, 186 (1895) (noting that if a defendant can "prove that [a prior] judgment was rendered by a foreign court, which had no jurisdiction," then "he has no occasion to impeach the justice of the judgment"). To suggest that another court fails to provide a full and fair opportunity to litigate, not only in one case but as a matter of basic structure, is a step we should not take lightly. By applying *Hicks*, we would straightforwardly decide the case without impugning the basic procedural fairness of the courts of the Santa Ana Pueblo.

Accordingly, I concur in the judgment of the Court.