**F I L E D**

PUBLISH

**July 18, 2007**

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

STEVEN MACARTHUR;
NATHANIEL PENN; MICHELLE
LYMAN; HELEN VALDEZ;
CANDACE LAWS; LINDA
CACAPARDO; SUE BURTON; AMY
TERLAAK; CANDACE HOLIDAY,
NICOLE ROBERTS,

    Plaintiffs,

        and

ALISON DICKSON; DONNA
SINGER; FRED RIGGS,

      Plaintiffs - Appellants/Cross-
      Appellees,

v.

SAN JUAN COUNTY; SAN JUAN
HEALTH SERVICES DISTRICT; J.
TYRON LEWIS, Commissioner; BILL
REDD, Commissioner; CRAIG
HALLS; REID M. WOOD; CLEAL
BRADFORD; ROGER ATCITTY;
JOHN LEWIS; JOHN
HOUSEKEEPER; KAREN ADAMS;
PATSY SHUMWAY; JAMES D.
REDD; L. VAL JONES; MANFRED
R. NELSON; RICHARD BAILEY;
MARILEE BAILEY; ORA LEE
BLACK; GARY HOLLADAY; LORI
WALLACE, also known as Laurie

No. 05-4295, 05-4310

Walker; ST. PAUL'S INSURANCE;
CARLA GRIMSHAW; GLORIA
YANITO; JULIE BRONSON; R.
DENNIS ICKES; LAURIE SCHAFER;
LYN STEVENS, San Juan County
Commissioner; MANUEL MORGAN,
San Juan County Commissioner;
NETTIE PRACK; GLEN IMEL,

Defendants - Appellees/Cross-
Appellants.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. No. 2:00-CV-584-BSJ)**

---

Susan Rose, Sandy, Utah, for Plaintiffs - Appellants/Cross-Appellees.

Carolyn Cox (and Blaine J. Benard, with her on the brief), Holme, Roberts &
Owen, L.L.P., Salt Lake City, Utah, for Defendants - Appellees/Cross-Appellants
San Juan Health Services District, Reid Wood, and Lauren Schafer.

Jesse C. Trentadue, (Michael W. Homer with him on the brief), Suitter Axland,
Salt Lake City, Utah, for Defendants - Appellees/Cross-Appellants San Juan
County, J. Tyron Lewis, Bill Redd, Craig Halls, and Richard Bailey.

---

Before **KELLY**, **EBEL**, and **McCONNEL**L, Circuit Judges.

---

**KELLY**, Circuit Judge.

---

Plaintiffs in this case seek enforcement of several preliminary injunction
orders issued by a court of the Navajo Nation. Although the decision to enforce a

non-final tribal court judgment is a matter of discretion, federal courts will ordinarily err on the side of enforcement of such judgments in the name of comity. We will not enforce a tribal court judgment, however, when the tribal court lacked subject matter jurisdiction. In the realm of tribal court jurisdiction, the regulatory authority of the tribe is often the issue which looms largest, and this case is no exception. Among other things, these appeals require us to examine the regulatory authority of the Navajo Nation over the activities of a nonmember of the tribe when the regulated entity is another independent sovereign acting in its governmental capacity.

Plaintiffs-Appellants Donna Singer, Fred Riggs, and Alison Dickson (collectively "Plaintiffs") appeal the federal district court's refusal to enforce three preliminary injunction orders issued by a Navajo district court against San Juan County, San Juan Health Services District ("SJHSD"), and numerous employees of those entities (collectively "Defendants"). Although the district court's judgment was ultimately in their favor, SJHSD and certain of its employees involved in the litigation also cross-appeal from the district court's judgment that the Navajo Nation possessed civil jurisdiction over several of the claims asserted against SJHSD, Roger Atcitty, and Reid Wood. In its opinion below, the district court explained that it would not enforce the preliminary injunction orders because, inter alia, the Navajo Nation lacks regulatory authority

over many of the Defendants, the preliminary injunction is interlocutory in nature, much of the preliminary injunction is now moot, and Defendants are nearly all entitled to sovereign immunity. See MacArthur v. San Juan County, 391 F. Supp. 2d 895, 1056-57 (D. Utah 2005). Our jurisdiction arises under 28 U.S.C. § 1291, and we reverse the district court insofar as it held that the Navajo Nation possessed regulatory and adjudicative authority over Plaintiffs' employment-related claims against SJHSD and Mr. Riggs's defamation claim against Reid Wood. We do, however, ultimately affirm the district court's judgment refusing to enforce the tribal court's preliminary injunction orders.

## Background

Because Plaintiffs do not appear to challenge the federal district court's factual recitation, we rely primarily on its version of the facts. Donna Singer, Fred Riggs, and Alison Dickson brought suit against San Juan County, SJHSD, and several employees of those entities in Navajo district court in August 2000. The specific defendants in that case relevant to these appeals were as follows: San Juan County, Utah; SJHSD; San Juan County Commissioners J. Tyron Lewis and Bill Redd, in their individual and official capacities; San Juan County Attorney Craig Halls, in his individual and official capacity; San Juan County Administrator Richard Bailey, in his individual and official capacity; Roger

- 4 -

Atcitty, John Lewis, and Karen Adams, members of SJHSD's Board of Trustees, in their individual and official capacities; Patsy Shumway, member of SJHSD's Board of Trustees, in her official capacity only; Reid Wood, SJHSD's Chief Executive Officer, in his individual and official capacity; and Lauren Shafer, SJHSD's Personnel Director of Nursing, in her individual and official capacity.

SJHSD is a special service district organized pursuant to Utah Code § 17A-2-1304 (1999), and is tasked with providing health care services to the citizens of San Juan County, Utah. At all relevant times, SJHSD operated the Montezuma Creek Health Clinic ("the Clinic"), which is located in San Juan County and within the exterior boundaries of the Navajo Nation. The record indicates that the land on which the Clinic is located is fee land owned by the State of Utah as part of the Navajo Trust Fund. SJHSD relinquished operation of the Clinic as of January 1, 2000, at which time Utah Navajo Health Systems, an entity affiliated with the Navajo tribe, took over operation.

Ms. Singer is the non-Indian spouse of an enrolled member of the Navajo Nation. She lives outside, but near, the Navajo reservation. Ms. Singer was employed as the manager of the Clinic from 1995 until her termination in December 1998. In the Navajo district court, Ms. Singer alleged that although she was an exempt employee, she was required to keep time cards, allegedly in violation of SJHSD policies. She claimed that on November 13, 1998, a mistake

was made on her time card but that she promptly provided a written explanation for the error. Shortly thereafter, she was handed a memorandum by Reid Wood, CEO of SJHSD, referring to allegations of time card fraud and informing her that she was being placed on administrative leave. A second memorandum from Mr. Wood accused her of employment-related misconduct—namely that the number of hours worked, as reflected on her time cards, was inflated—and notified her of the scheduling of a pre-disciplinary hearing. Following a meeting with Ms. Singer on December 4, 1998, Mr. Wood prepared yet another memorandum to her, dated December 7, explaining that due to the inconsistencies in her time cards, she was being terminated. Ms. Singer later filed a complaint with the Office of Navajo Labor Relations ("ONLR") seeking reinstatement. Eventually, Ms. Singer was rehired at the Clinic after its operation was handed over to Utah Navajo Health Systems.

Mr. Riggs is an enrolled member of the Navajo Nation who resides within the exterior boundaries of the Navajo reservation in New Mexico. SJHSD terminated his employment on November 4, 1998 as part of a reduction in force, but immediately rehired him in a lesser position and at a lesser rate of pay on the condition that he keep time cards. According to Mr. Riggs, he was unaware that on his very first time card he underreported the number of hours of leave taken. As with Ms. Singer, Mr. Wood advised Mr. Riggs in writing that he was accused

of time card fraud and placed Mr. Riggs on paid administrative leave. Mr. Riggs likewise had a pre-disciplinary hearing with Mr. Wood on December 4, 1998, but, unlike Ms. Singer, who was terminated, Mr. Wood placed Mr. Riggs on probation for thirty days. Mr. Riggs alleges, however, that he was kept on probation longer than thirty days. On or about December 15, 1998, Mr. Riggs filed a grievance with SJHSD regarding Mr. Wood's disciplinary action, and on February 12, 1999, a grievance hearing was held (the record is unclear as to what the result of this hearing was), but Mr. Riggs avers that the grievance process was tainted by Mr. Wood's influence and lacked impartiality. Mr. Riggs also later filed a grievance with the ONLR. Mr. Riggs remained an employee of the Clinic after Utah Navajo Health Systems assumed operation.

Mr. Dickson, the third plaintiff, is an enrolled member of the Navajo Nation residing within the exterior boundaries of the Navajo Reservation in Utah. Mr. Dickson was initially hired by SJHSD in March 1998 as a full-time, temporary office clerk. He applied for full-time, permanent employment in November or December of 1998 but was refused. Mr. Dickson claims that the refusal to make him a permanent employee violated internal SJHSD policies. He also alleges he was denied a hearing on his grievance. In the Navajo district court, Mr. Dickson also complained about racially insensitive and derogatory remarks allegedly made by Mr. Wood. Like Ms. Singer and Mr. Riggs, Mr.

Dickson was permanently employed by Utah Navajo Health Systems at the Clinic after its takeover.

In their complaint filed in the Navajo district court, Plaintiffs asserted numerous claims arising primarily out of their employment at the Clinic. Those claims included the following: violation of the right to free speech as protected by the Navajo Nation, the United Nations, and the United States; violation of the right to freedom of assembly as protected by the Navajo Nation, the United Nations, and the United States; violation of the right to due process as protected by the Navajo Nation, the United Nations, and the United States; wrongful hiring; defamation and tortious interference with future contractual relations; theft; violation of the right to equal protection as protected by the Navajo Nation, the United Nations, and the United States; discrimination as part of an ongoing pattern; intentional and negligent infliction of emotional distress; violation of fiduciary duties; misfeasance; malfeasance in office; obstruction of justice; misuse of judicial process; defamation per se; and the endangerment of Navajo patients.

On December 28, 1999, after holding at least one evidentiary hearing, the Navajo district court found that Plaintiffs' claims had a high likelihood of success on the merits and issued a preliminary injunction ordering Defendants to undertake the following actions: reinstate Ms. Singer and Mr. Riggs to their

former positions with full back-pay; offer Mr. Dickson full-time employment with full back-pay and benefits; delete and expunge all disciplinary comments regarding the incidents at issue from Plaintiffs' personnel files; refrain from placing all Physician Assistants on time card requirements; refrain from interfering with clinic operations or moving clinic personnel; pay all attorney's fees, costs, and expenses related to the litigation; and assist, in any manner necessary, diabetic patients' return to the Clinic for treatment. The court also prohibited Defendants from eliminating emergency medical technician services within the Navajo Nation or interfering with laboratory or pharmaceutical services to the Clinic.

Following Defendants' submission of a motion to dissolve/modify the preliminary injunction, the tribal court issued another order on March 1, 2000, which reiterated the conditions of the prior preliminary injunction and also required Defendants to carry out the conditions of the prior injunction by March 3, 2000, to immediately make payment of past due billings of the Clinic, to refrain from interfering with any form of patient care being provided at the Clinic, and to immediately cease billing eligible IHS patients for medical services. In an effort to further enforce its order, the court informed the parties that Defendants would be required to pay $10,000 per day for every day after March 3, 2000 that Defendants failed to comply with its order, and that the individual defendants and

their counsel would be personally liable for $1,000 of the $10,000 daily amount.

Shortly thereafter, Plaintiffs filed a motion for a special order, and, in response, the tribal court issued a third order on March 6, 2000. That order required Defendants to take the following additional actions: refrain from alienating any money, property, or assets of any type until the relief granted in the preliminary injunction was satisfied; provide an accounting of all Defendants' assets to Plaintiffs; list Plaintiffs first in order of priority as secured creditors on Defendants' files with the County Recorder of San Juan County; and provide Defendants' 1998 and 1999 tax returns to Plaintiffs. The court further explained that any disobedience of the order would result in the issuance of arrest warrants for Defendants, and it also granted Plaintiffs leave to seek enforcement of the court's orders in Utah or federal court.

Plaintiffs accepted the tribal court's invitation to seek enforcement of the orders and filed suit in federal district court on July 25, 2000. They sought both a declaratory judgment and a preliminary injunction enforcing the tribal court's orders. Less than two months later, Defendants filed a motion to dismiss Plaintiffs' declaratory judgment claims on grounds of sovereign immunity and Plaintiffs filed a cross-claim for summary judgment. The district court granted Defendants' motion to dismiss on October 30, 2000, reasoning that Defendants enjoyed sovereign immunity from suit in tribal court and that their sovereign

immunity had not been waived vis-à-vis the Navajo Nation. For the same reason, the district court also denied Plaintiffs' request for a preliminary injunction and their cross-claim for summary judgment. Plaintiffs appealed from that order.

On appeal, we vacated the district court's order and remanded for further proceedings.[1] See MacArthur v. San Juan County, 309 F.3d 1216, 1228 (10th Cir. 2002) (hereinafter MacArthur I). We held that the district court erred in deciding the sovereign immunity issue before first determining whether the Navajo Nation possessed adjudicative authority over the activities of Defendants, who are nearly all nonmembers of the Navajo Nation. See id. at 1227. We explained that sovereign immunity and tribal regulatory authority are distinct legal doctrines and, pursuant to Nevada v. Hicks, 533 U.S. 353 (2001), the adjudicative authority of tribal courts is a threshold question that must be answered before a court may consider the merits of the underlying action. See id. at 1226-27. We therefore directed the district court, on remand, to conduct an analysis of the Navajo Nation's adjudicative authority over Defendants pursuant to Montana v. United

---

[1] In a separate order, the district court dismissed Plaintiffs' claims against Truck Insurance and R. Dennis Ickes on grounds that the Navajo Nation did not possess regulatory authority over their activities. We affirmed that decision on appeal. See MacArthur I, 309 F.3d at 1222-25. Plaintiffs dedicate significant portions of their brief on appeal arguing why those claims should not have been dismissed. Under the law of the case doctrine, however, we are not free to reconsider the district court's dismissal of those claims or the prior panel's subsequent affirmance of that decision. See Prairie Band Potawatomi Nation v. Wagnon, 476 F.3d 818, 823 (10th Cir. 2007).

States, 450 U.S. 544 (1981), before reaching the separate issue of sovereign immunity. See id. at 1227.

That is exactly what the district court did. In a published order dated October 12, 2005, the district court rendered judgment in Defendants' favor. In doing so, the district court held that the Navajo Nation possessed civil regulatory and adjudicatory authority over the claims of Mr. Riggs and Mr. Dickson arising out of their consensual employment relationships with SJHSD. See MacArthur v. San Juan County, 391 F. Supp. 2d 895, 1056 (D. Utah 2005) (hereinafter MacArthur II). It also held that the Navajo Nation possessed adjudicatory authority over Mr. Riggs's defamation claim against Mr. Wood and all three Plaintiffs' employment-related claims against Mr. Atcitty, who is an enrolled member of the Navajo Nation. See id. The district court held that the Navajo Nation did not possess regulatory or adjudicatory authority over the activities of the remaining Defendants. See id. Despite the fact that the district court determined that the Navajo Nation possessed subject matter jurisdiction over some of Plaintiffs' claims, it nonetheless refused to issue an injunction or declaratory judgment to enforce the tribal court's orders as to those claims because the orders were non-final and interlocutory in nature, most of the relief granted in the orders has since been rendered moot, Plaintiffs had not properly exhausted their claims, and most of the claims were barred by sovereign

immunity. See id. at 1056-57.

Although deciphering Plaintiffs' arguments on appeal is an extremely difficult task,[2] they appear to argue that: (1) Defendants may not challenge the propriety of the Navajo district court's orders because they failed to exhaust their remedies in tribal court; (2) the Navajo district court's preliminary injunction is entitled to full faith and credit; (3) federal courts lack the authority to question whether the Navajo district court possessed subject matter jurisdiction and must enforce its preliminary injunction orders without independent review; (4) laws enacted, and policies followed, by Congress and the President subsequent to Montana nullified its framework for defining the inherent sovereignty of Indian tribes; and (5) sovereign immunity does not apply to shield Defendants from liability.

## Discussion

I.    Standard of Review

We review a district court's grant of summary judgment de novo, applying the same legal standard as below. Jencks v. Modern Woodmen of Am., 479 F.3d

---

[2] We note that Plaintiffs' briefing in this case has in common many of the problems identified with regard to the briefing in appeal 05-4317. Nonetheless, we reach the merits because we are able to sufficiently decipher Plaintiffs' arguments, and those arguments are non-frivolous enough to warrant full review and response.

- 13 -

1261, 1264 (10th Cir. 2007). Summary judgment is only appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

We also review a district court's dismissal for failure to state a claim de novo. Lovell v. State Farm Mut. Auto Ins. Co., 466 F.3d 893, 898 (10th Cir. 2006). We may uphold the grant of a motion to dismiss if, viewing the well-pleaded factual allegations in the complaint as true and in the light most favorable to the non-moving party, the complaint does not contain "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1968-69, 1974 (2007) (explaining that the pleading standard by which courts look to whether the plaintiff can prove "no set of facts" giving rise to a claim "has earned its retirement"); see also The Ridge at Red Hawk, L.L.C. v. Schneider, – F.3d –, 2007 WL 1969681, at *3 (2007).

II.    Enforcement of the Navajo District Court's Preliminary Injunction Orders

While Plaintiffs have sought both a declaratory judgment and a preliminary injunction, their primary objective in this litigation is to enforce the Navajo district court's preliminary injunction orders granting them broad relief. The primary issue on appeal, therefore, is whether there is anything to prevent us from

- 14 -

recognizing and enforcing those orders. But before we address that question head-on, there are a number of threshold issues to be resolved.

To begin, Plaintiffs argue that Defendants may not challenge the enforceability of the tribal court orders because they failed to exhaust available tribal court remedies. "The Supreme Court . . . has required litigants to exhaust their tribal court remedies before a district court may evaluate the existence of a tribal court's jurisdiction." Burrell v. Armijo, 456 F.3d 1159, 1168 (10th Cir. 2006) (citing Iowa Mut. Ins. Co. v. LaPlante, 480 U.S. 9, 15-16 (1987)). Ordinarily, however, it is federal court plaintiffs, not defendants, who are required to exhaust. Also, Defendants no longer had tribal court remedies available to them once Plaintiffs sought enforcement in federal court. We think that he who defeats another's ability to exhaust cannot then assert failure to exhaust as a defense. Moreover, the remedy for a litigant's failure to exhaust is not enforcement of the tribal court's judgment, as Plaintiffs seek, it is a dismissal or abeyance of the action until exhaustion has occurred, see Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians, 471 U.S. 845, 857 (1985)—neither of which Plaintiffs request. Finally, we possess all the facts necessary to conduct our jurisdictional inquiry and thus exhaustion would serve no purpose other than delay. See Burrell, 456 F.3d at 1168 (listing five exceptions to the exhaustion requirement).

Next, we must determine the proper mechanism by which we might enforce the Navajo district court's orders. Plaintiffs assert that the proper mechanism is the Full Faith and Credit Clause of the Constitution, see U.S. Const. art. IV, § 1, and the full faith and credit principles found within 28 U.S.C. § 1738. While the Constitution only requires that states grant full faith and credit to the judgments of sister states, § 1738 extends that requirement to the courts of the United States and its territories and possessions. See U.S. Const. art. IV, § 1; 28 U.S.C. § 1738. As we noted in our prior decision in this case, the Supreme Court has broadcast mixed signals as to whether the tribes are to be considered territories or possessions of the United States and thus included within the language of § 1738. See MacArthur I, 309 F.3d at 1225. Moreover, "[t]his court has not yet decided whether a tribal court's judgment is entitled to preclusive effect under the Full Faith and Credit Clause or as a matter of comity." Burrell, 456 F.3d at 1176 (McConnell, J., concurring) (internal citations omitted); see also MacArthur I, 309 F.3d at 1225. Regardless, we need not resolve the issue because even if we were required to enforce tribal judgments as a matter of full faith and credit, only final judgments are subject to enforcement pursuant to full faith and credit principles, see Durfee v. Duke, 375 U.S. 106, 111 (1963); Felix S. Cohen, Handbook of Federal Indian Law § 7.07[2][a], at 658 (2005 ed.) (hereinafter Handbook), and the preliminary injunction orders sought to be enforced in this

case hardly constitute final judgments, see Sole v. Wyner, 127 S. Ct. 2188, 2195 (2007) ("At the preliminary injunction stage, the court is called upon to assess the probability of the plaintiff's ultimate success on the merits."); Kiernan v. Utah Transit Auth., 339 F.3d 1217, 1220 (10th Cir. 2003) ("A preliminary injunction serves to preserve the status quo pending a final determination of the case on the merits.").[3] Therefore, if we are to enforce the preliminary injunction orders, it must be as a matter of comity.

Plaintiffs also argue that we have no power to do anything other than enforce the Navajo district court's orders. In other words, once the tribal court issued its preliminary injunction orders and Plaintiffs arrived at federal court to enforce them, the jurisdiction of the federal courts is limited to enforcement, which is mandatory on our part. This argument misunderstands federal court jurisdiction and the discretion we possess under the doctrine of comity. The question of the regulatory and adjudicatory authority of the tribes—a question bound up in the decision to enforce a tribal court order—is a matter of federal law giving rise to subject matter jurisdiction under 28 U.S.C. § 1331.[4] See Nat'l

---

[3] Although the orders at issue did award attorney's fees, back-pay, and other monetary awards, the amount of those awards was never reduced to a sum certain and thus the orders are not final with respect to those awards. See Harbert v. Healthcare Servs. Group, 391 F.3d 1140, 1145 (10th Cir. 2004) ("[A]n order that determines liability but leaves damages to be calculated is not final.").

[4] In this case, Plaintiffs argue that federal law has not divested the Navajo Nation of its civil jurisdiction over Defendants' activities—in fact, they allege

Farmers Union, 471 U.S. at 852; Wilson v. Marchington, 127 F.3d 805, 813 (9th Cir. 1997). Additionally, we proceed cautiously and carefully when called upon to enforce foreign judgments. While there is no doubt that "[t]ribal courts have repeatedly been recognized as appropriate forums for the exclusive adjudication of disputes affecting important personal and property interests of both Indians and non-Indians," Santa Clara Pueblo v. Martinez, 436 U.S. 49, 65-66 (1978), the decision whether to enforce non-final orders of a tribal court is left primarily to our discretion under the doctrine of comity, see Burrell, 456 F.3d at 1168, 1171; Wilson, 127 F.3d at 810 ("[C]omity . . . affords the best general analytical framework for recognizing tribal judgments.").

The basic dilemma the doctrine of comity is meant to solve is that "[n]o law has any effect, of its own force, beyond the limits of the sovereignty from which its authority derived." Hilton v. Guyot, 159 U.S. 113, 163 (1895). Thus,

---

federal law has granted it such jurisdiction and seek a declaratory judgment saying as much. As a result, we agree with the district court's observation that "the action . . . is one arising under federal law because it turns on substantial questions of federal law." MacArthur II, 391 F. Supp. 2d at 987-88 (internal quotations and modifications omitted); see also Superior Oil Co. v. United States, 798 F.2d 1324, 1329 (10th Cir. 1986) ("[I]n cases encompassing the federal question whether a tribal court has exceeded its lawful limits of jurisdiction involving an exercise of civil subject-matter jurisdiction . . . the federal district court is empowered to review a tribal court decision under 28 U.S.C. § 1331."); Wilson v. Marchington, 934 F. Supp. 1176, 1178 (D. Mont. 1995), reversed on other grounds at 127 F.3d 805 (9th Cir. 1997). This is especially true considering the prior panel's holding that the Montana analysis is a threshold issue. See MacArthur I, 309 F.3d at 1226-27.

comity "is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws."[5] Id. at 164. Comity is not an inexorable command, see id., and a request for recognition of a foreign judgment may be rebuffed on any number of grounds, see Wilson, 127 F.3d at 810; Handbook § 7.07[2][a], at 658 ("In contrast to the full faith and credit rule, the comity doctrine allows the receiving court greater discretion to determine whether to enforce the foreign judgment.").

Although recognition and enforcement of tribal court judgments as a matter of comity also lies within our discretion, "[t]he importance of tribal courts and the dignity we accord their decisions will weigh in favor of comity." Bird v. Glacier Elec. Coop., Inc., 255 F.3d 1136, 1142 (9th Cir. 2001). Nonetheless, recognition of a tribal court judgment must be refused where one of two circumstances exist. First, comity must not be granted where the tribal court lacked either personal or subject matter jurisdiction. Burrell, 456 F.3d at 1171. Second, a tribal court judgment must not be enforced where the party against whom enforcement was sought was not afforded due process of law. Id. Apart from those two mandatory

_____

[5] Under Utah law, foreign judgments not entitled to full faith and credit may only be enforced under the doctrine of comity. See Mori v. Mori, 931 P.2d 854, 856 (Utah 1997) (citing Hilton).

- 19 -

grounds on which to refuse enforcement, there are several grounds on which a court may exercise its discretion to refuse enforcement of a tribal judgment. See Wilson, 127 F.3d at 810 (listing several possible discretionary reasons for the non-enforcement of tribal judgments).

In this case, we must refrain from enforcing much of the Navajo district court's orders because that court lacked subject matter jurisdiction (i.e. adjudicatory authority) over nearly all of Defendants' activities. Additionally, under the unique circumstances of this case, we will exercise our discretion to similarly refuse to enforce the tribal court judgment even as to those claims over which the tribal court arguably had subject matter jurisdiction (those asserted against Mr. Atcitty).

A.    Tribal Court Subject Matter Jurisdiction - The Analytical Framework

"Originally the Indian Tribes were separate nations within what is now the United States." Williams v. Lee, 358 U.S. 217, 218 (1959). As separate nations, they enjoyed the same degree of sovereignty as that enjoyed by all other sovereign nations the world over. Through their original incorporation into the United States as well as through specific treaties and statutes, however, they have lost several important aspects of their inherent sovereignty. Id. As to which aspects of inherent sovereignty have been retained and which have been divested, "[t]he areas in which such implicit divestiture of sovereignty has been held to have

occurred are those involving the relations between an Indian tribe and nonmembers of the tribe." United States v. Wheeler, 435 U.S. 313, 326 (1978). But the Indian tribes' status as dependent nations has not divested them of "the powers of self-government." See id.

Despite the fact that the Navajo Nation retains control over its self-government, "[i]t is true that in the exercise of the powers of self-government, as in all other matters, the Navajo Tribe, like all Indian Tribes, remains subject to ultimate federal control." Id. at 327. This is because "the Constitution grants Congress broad general powers to legislate in respect to Indian tribes, powers that [the Supreme Court has] consistently described as 'plenary and exclusive.'" United States v. Lara, 541 U.S. 193, 200 (2004). Congress's "plenary and exclusive" powers in respect to the tribes derive from the Indian Commerce Clause (U.S. Const. art. I, § 8, cl. 3), treaties entered into by the Executive Branch, and preconstitutional powers necessarily inherent in any federal government. See id. at 200-01. The upshot of Congress's plenary power over the tribes is that it may "enact legislation that both restricts, and in turn, relaxes . . . restrictions on tribal sovereign authority." Id. at 202.

In the absence of congressional legislation, however, tribal governments retain regulatory authority over all matters falling within their inherent sovereignty. In Montana v. United States, 450 U.S. 544 (1981), the Supreme

- 21 -

Court laid down a general rule that "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." Id. at 565. There are, nevertheless, two narrow exceptions to the general rule against tribal authority over nonmembers. First, "[a] tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." Id. Second, "[a] tribe may . . . exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." Id. at 566.

Although Montana dealt exclusively with the tribes' regulatory authority over non-Indians, see Strate v. A-1 Contractors, 520 U.S. 438, 453 (1997) ("Montana immediately involved regulatory authority . . . ."), the Supreme Court has since announced that "a tribe's adjudicative jurisdiction does not exceed its legislative jurisdiction," id. It has also since explained that it has left "open the question whether a tribe's adjudicative jurisdiction over nonmember defendants equals its legislative jurisdiction." Nevada v. Hicks, 533 U.S. 353, 358 (2001). Thus, our analysis must proceed as follows: initially, we must determine whether each party's status is such that Montana's general rule against regulatory authority over nonmembers is implicated; in other words, we must determine whether the

- 22 -

party over whom the tribe is seeking to assert regulatory authority is a nonmember of the Navajo Nation. If the party in question is a nonmember, then we must decide whether either of the two exceptions identified in Montana applies. If one of the two Montana exceptions applies and the tribe therefore possesses regulatory authority over the nonmember, we must determine whether the nonmember's activities also fall within the Tribe's adjudicative authority.

Before conducting this analysis, we must resolve two matters. First, there does not appear to be, and Plaintiffs have not identified any, congressional legislation expressly authorizing the Navajo Nation to exercise regulatory authority over Defendants in this case. Stated slightly differently, Congress has passed no law which permits the Navajo Nation to exercise regulatory authority over nonmember entities or individuals who employ members of the tribe within the confines of the reservation; nor has it passed a broader statute which arguably encompasses nonmember employers. Consequently, any regulatory authority the Navajo Nation might possess is strictly a byproduct of its retained inherent sovereignty.

Second, Plaintiffs contend that laws and/or policies enacted by Congress and the Executive Branch subsequent to Montana nullified its framework for defining the inherent sovereignty of Indian tribes. This argument is unavailing. Many of the sources on which Plaintiffs rely predate Montana and thus cannot

serve as the basis for overturning that decision. We have, nonetheless, reviewed each policy, statute, treaty, and contract relied upon by Plaintiffs and can find no indication whatsoever that <u>Montana</u> has been altered in any way.[6] Finally, as recently as 2001, the Supreme Court applied the <u>Montana</u> framework in determining whether the Navajo Nation possessed regulatory authority over nonmembers of the tribe, <u>see</u> <u>Adkinson Trading Co.</u>, 532 U.S. at 654-57—a strong indication that the <u>Montana</u> framework remains alive and well. Consequently, we will proceed to apply the <u>Montana</u> framework.

B.    <u>Whether Montana's General Rule Applies</u>

As previously stated, <u>Montana</u> only applies insofar as the tribe in question is seeking to assert regulatory authority over the activities of a nonmember. <u>See</u> 450 U.S. at 565-66. For a long while, however, <u>Montana</u>'s applicability seemed to hinge not only on the status of the party over whom authority was exercised but also on the character of the property on which the regulated activities occurred. This stemmed from the fact that "in <u>Montana</u>, as in later cases following

---

[6] At oral argument, and in a motion for summary disposition filed since, Plaintiffs primarily relied upon a Bureau of Indian Affairs contract with the Navajo Nation in arguing that the jurisdiction of the Navajo courts has been expanded and <u>Montana</u> no longer controls. We have carefully reviewed the copy of that contract provided by Plaintiffs, <u>see</u> Aplt. App. at 178-92, and find no mention of <u>Montana</u>, the inherent sovereignty of the Navajo Nation, or the jurisdiction of its courts, and thus Plaintiffs' reliance on that contract is misguided.

_Montana_'s instruction . . . the challenged tribal authority related to nonmember activity on alienated, non-Indian reservation land." _Strate_, 520 U.S. at 454. Litigants began noticing this common denominator, and in _Strate_ the tribal petitioners argued that _Montana_ was inapplicable because the land on which the regulated activity—an auto accident—occurred was not traditional non-Indian fee land due to the fact that, like here, it was held in trust for the tribe and its members. _See id._ Justice Ginsburg, writing for the Court, acknowledged "that tribes retain considerable control over nonmember conduct on tribal land," but held that the nature of the land in question was more akin to alienated, non-Indian land because the Tribe could not "assert a landowner's right to occupy and exclude." _See id._ at 454-56. Thus, _Montana_ applied.

The notion that _Montana_'s applicability turns, in part, on whether the regulated activity took place on non-Indian land was finally put to rest in _Hicks_. In that case, the Navajo Nation attempted to assert regulatory authority over nonmembers' activities unquestionably occurring on Indian land. _See Hicks_, 533 U.S. at 359. Because the activities occurred on Indian land, Hicks argued that _Montana_ had no relevance. In rejecting that argument, the Court explained that _Oliphant v. Suquamish Indian Tribe_, 435 U.S. 191 (1978)—the case upon which _Montana_ primarily relied in defining the scope of the tribes' inherent sovereign powers—drew no distinction between Indian and non-Indian land. _See Hicks_, 533

U.S. at 359.  It also noted that language from Montana itself clearly implied that the general rule announced in that case applies to Indian and non-Indian land alike.  See id. at 359-60.  Thus, while the nature of the property is a factor—and possibly a dispositive one—to consider in determining whether the regulated activity falls within either of Montana's two exceptions, see id. at 360, the only relevant characteristic for purposes of determining Montana's applicability in the first instance is the membership status of the individual or entity over which the tribe is asserting authority, see id. at 388 (O'Connor, J., concurring in part) ("[T]he majority is quite right that Montana should govern our analysis of a tribe's civil jurisdiction over nonmembers both on and off tribal land.").

Montana's presumption against tribal civil jurisdiction over nonmembers applies nearly across the board in this case because, with the exception of Mr. Atcitty, Defendants are all nonmembers of the Navajo Nation.[7]  Mr. Atcitty, who was a member of SJHSD's Board of Trustees, is an enrolled member of the Navajo Nation and resides within the borders of the Navajo reservation.  As a result, while it is unclear whether the Navajo Nation possessed civil jurisdiction over Mr. Atcitty's activities, given that they were undertaken exclusively in his

---

[7]  Even assuming the rule laid down in Strate were still operable, Montana would nevertheless apply because Plaintiffs have made no showing that the Navajo Nation could "assert a landowner's right to occupy and exclude" others from the trust land on which the Clinic sits.  See 520 U.S. at 456.

capacity as a state official, cf. id. at 362 ("When . . . state interests outside the reservation are implicated, States may regulate the activities even of tribe members on tribe land . . . ."), it is clear that he does not fall within the ambit of Montana. We, therefore, proceed to apply Montana to all Defendants except Mr. Atcitty.

C.    Application of Montana

The starting point under Montana is, of course, with the general rule "that the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." 450 U.S. at 565. The general rule remains in effect unless a nonmember enters into a consensual relationship with the tribe or its members, or the activities of a nonmember threaten the tribe's right to self-government. Id. at 565-66. Because all Defendants, with the lone exception of Mr. Atcitty, are nonmembers, one of these two exceptions must apply in order for the Navajo Nation to assert regulatory authority over their actions.

1.    Ms. Singer

Ms. Singer's status as a nonmember of the Navajo Nation renders application of the two Montana exceptions exceedingly straightforward in her case. There is no indication, and Plaintiffs do not contend, that any of the Defendants in this case entered into a consensual relationship with the Navajo Nation itself, and accordingly we are only concerned here with consensual

- 27 -

relationships between Defendants and the tribe's members. Because she is a nonmember, however, there is no possibility that Defendants' actions with respect to Ms. Singer could have resulted in a consensual relationship with a member of the Navajo Nation. Moreover, Defendants' employment-related activities in regard to another nonmember on non-Indian land in no way affects the Navajo Nation's right to govern itself. Thus, neither Montana exception applies and the Navajo Nation did not possess regulatory authority over Defendants' activities vis-à-vis Ms. Singer.

2.    Mr. Riggs and Mr. Dickson

The fact that Mr. Riggs and Mr. Dickson are enrolled members of the Navajo Nation renders application of the Montana exceptions more complicated than in Ms. Singer's case.

a.    The Consensual Relationship Exception

Our first task is to determine whether any of the Defendants entered into a consensual relationship with Mr. Riggs or Mr. Dickson "through commercial dealing, contracts, leases, or other arrangements." Id. at 565. The district court below held that SJHSD had entered into such a relationship with Mr. Riggs and Mr. Dickson via its employment relationship with them. See MacArthur II, 391 F. Supp. 2d at 1011-12. Plaintiffs do not appear to argue that a consensual relationship was formed in any other manner.

There is no doubt that an employment relationship between two parties is contractual in nature.  See, e.g., Perry v. Woodward, 199 F.3d 1126, 1133 (10th Cir. 1999) ("[T]he employment-at-will relationship encompasses sufficient contractual rights to support section 1981 claims for wrongful termination."); Rackley v. Fairview Care Ctrs., Inc., 23 P.3d 1022, 1026 (Utah 2001) ("[A]n employment relationship entered into for an indefinite period of time is presumed to be at-will and gives rise to a contractual arrangement . . . .")  In fact, the common law tort cause of action for interference with contractual relations encompasses interference with employment, even where the employment is at-will.  See Haddle v. Garrison, 525 U.S. 121, 126 (1998) ("The kind of interference with at-will employment relations alleged here is merely a species of the traditional torts of intentional interference with contractual relations and intentional interference with prospective contractual relations.").  Consequently, Montana's consensual relationship exception applies to a nonmember who enters into an employment relationship with a member of the tribe.

But not just any consensual employment relationship will do.  Rather, Supreme Court precedent clearly limits the regulatory authority of tribes—at least that which is derived solely from their inherent sovereignty—to the reservation's borders.  See Atkinson Trading Co. v. Shirley, 532 U.S. 645, 653 (2001) ("An Indian tribe's sovereign power to tax—whatever its derivation—reaches no

- 29 -

further than tribal land."); Strate, 520 U.S. at 446 ("Montana thus described a general rule that, absent a different congressional direction, Indian tribes lack civil authority over the conduct of nonmembers on non-Indian land within a reservation, subject to two exceptions . . . .") (emphasis added); Montana, 450 U.S. at 565 ("To be sure, Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations . . . .") (emphasis added). The notion that inherent sovereignty ceases at the reservation's borders is consistent with the Court's statement in Wheeler that "the dependent status of Indian tribes within our territorial jurisdiction is necessarily inconsistent with their freedom independently to determine their external relations." 435 U.S. at 326. It would simply strain credulity to hold that the Navajo Nation may exercise regulatory authority over any employer in the United States so long as the individual or entity employs an enrolled member of the tribe. Therefore, we hold that a tribe only attains regulatory authority based on the existence of a consensual employment relationship when the relationship exists between a member of the tribe and a nonmember individual or entity employing the member within the physical confines of the reservation.

Applying the foregoing principles to this case, the only Defendant arguably falling within the consensual relationship exception is SJHSD itself. SJHSD entered into contractual employment relationships with Mr. Riggs and Mr.

Dickson, and they were employed at the Clinic within the exterior boundaries of the Navajo reservation. Mr. Riggs and Mr. Dickson did not enter into a contractual employment relationship with any other Defendant. While some of the Defendants admittedly played a tangential role in SJHSD's employment relationships with the two, none of the Defendants, other than SJHSD, entered into the type of consensual relationship with Mr. Riggs or Mr. Dickson sufficient to fall within the exception. In other words, it is self-evident that none of them entered into "commercial dealing, contracts, [or] leases" with either Mr. Riggs or Mr. Dickson. And being one's coworker or superior standing alone cannot possibly constitute the type of "other arrangements" the Supreme Court had in mind in Montana. If those relationships were sufficient, "the exception would swallow the rule." Atkinson Trading Co., 532 U.S. at 655.

Apart from finding that SJHSD fell within the consensual relationship exception, the district court also held that Reid Wood was subject to the regulatory authority of the Navajo Nation at least insofar as Mr. Riggs's defamation claim was concerned.[8] See MacArthur II, 391 F. Supp. 2d at 1014. The district court came to this conclusion because Mr. Wood "was a central character in the events . . . that form the factual basis for plaintiffs['] . . .

_____

[8] Both SJHSD and Mr. Wood have cross-appealed the district court's judgment holding that the Navajo Nation possessed regulatory authority over each of them.

- 31 -

employment-related claims," and because the Navajo district court did not clearly err in finding that Mr. Wood's characterization of Mr. Riggs's time card errors as fraudulent may make out an actionable defamation claim. See id. The primary fault with the district court's holding lies in the lack of a "central character" exception to the general presumption against the exercise of tribal regulatory authority over nonmembers. Moreover, hanging regulatory authority on the fact that Mr. Wood's statements may constitute actionable defamation places the cart before the horse. That a cause of action may successfully be asserted against Mr. Wood says nothing about the Tribe's ability to regulate Mr. Wood's activities in the first place. Without civil jurisdiction the cause of action is null and void, regardless of whether it might result in a successful judgment if there was jurisdiction. Properly applying Montana, it is clear that Mr. Wood did not enter into the type of consensual relationship required for the Navajo Nation to obtain regulatory authority over him—only SJHSD, as the employer of Mr. Riggs and Mr. Dickson, arguably did.

Although at first blush it appears that SJHSD's consensual employment relationships with Mr. Riggs and Mr. Dickson fall within Montana's consensual relationship exception, this case is unique in that the consensual relationship at issue involves a political subdivision of the State of Utah, and it was entered into pursuant to an exercise of the police power on non-Indian land. Relying upon

Hicks, SJHSD contends its status as a state entity removes it from Montana's first exception. In Hicks, Justice Scalia, writing for the majority, stated in a footnote that, "Read in context, an 'other arrangement' is clearly another private consensual relationship, from which the official actions in this case are far removed." 533 U.S. at 359 n.3. SJHSD seizes upon this statement and argues that an employment relationship between a member of a tribe and a governmental entity on non-Indian land (even within the exterior boundaries of the reservation) cannot meet Montana's first exception, even if a similar private employment relationship would.

SJHSD's argument finds strong support in Hicks. In her concurrence in that case, Justice O'Connor read the majority opinion as disavowing civil jurisdiction based on non-private consensual relationships. She further expressed reservation that the Court's disavowment created a per se rule that consensual relationships entered into between state governments and tribes, "such as contracts for services or shared authority over public resources," could no longer give rise to tribal civil jurisdiction. See id. at 393-94 (O'Connor, J., concurring). Justice Scalia responded in kind with the following:

> The [Montana] Court . . . obviously did not have in mind States or state officers acting in their governmental capacity; it was referring to private individuals who voluntarily submitted themselves to tribal regulatory jurisdiction by the arrangements that they (or their employers) entered into. This is confirmed by the fact that all four of the cases in the immediately following citation involved private commercial actors. See

- 33 -

Confederated Tribes, 447 U.S., at 152 (nonmember purchasers of cigarettes from tribal outlet); Williams v. Lee, 358 U.S., at 217 (general store on the Navajo reservation); Morris v. Hitchcock, 194 U.S. 384 (1904) (ranchers grazing livestock and horses on Indian lands "under contracts with individual members of said tribes"); Buster v. Wright, 135 F. 947, 950 (8th Cir. 1905) (challenge to the "permit tax" charged by a tribe to nonmembers for "the privilege . . . of trading within the borders").

Id. at 372.

Justice Scalia is not the only one to have observed that the cases relied upon in support of Montana's consensual relationship exception dealt exclusively with private conduct. Three years prior to Hicks, the Ninth Circuit observed that all of the cases cited to support Montana's first exception "involve either direct regulation by a tribe of non-Indian activity on the reservation or lawsuits between a private party and the tribe or tribal members arising from an on-reservation transaction or agreement." County of Lewis v. Allen, 163 F.3d 509, 515 (9th Cir. 1998) (en banc). As a result of that observation, the en banc court held that an agreement between the State of Idaho and the Nez Perce Tribe did not qualify as a consensual relationship of the type giving rise to tribal regulatory authority. See id.

We too adhere to the distinction between private individuals or entities who voluntarily submit themselves to tribal jurisdiction and "States or state officers acting in their governmental capacity." The power to exercise regulatory authority over another independent sovereign on that sovereign's land, even

where a consensual relationship is involved, closely resembles the "freedom independently to determine their external relations," which the tribes necessarily relinquished as a result of their dependent status. See Wheeler, 435 U.S. at 326. Thus, we hold, in the absence of congressional delegation, the tribes may not regulate a State qua State on non-Indian land[9] (even within the exterior boundaries of the reservation) based only on a consensual relationship between members of the tribe and the State.[10]

In the instant case, the employment relationships at issue involved two members of the Navajo Nation and SJHSD, a political subdivision of the State of Utah. SJHSD is strictly a creature of Utah law, see Utah Code Ann. § 17A-2-1304 (1999), and nearly all of its board members were state employees. The employment relationships at issue were entered into exclusively in SJHSD's governmental capacity, and those relationships were part and parcel of SJHSD's duty to provide medical services to residents of San Juan County. See Pueblo

---

[9] When we use the term "non-Indian land," we use it in the sense that the Supreme Court does: The land involved is non-Indian fee land or akin to non-Indian fee land in that the tribe may not "assert a landowner's right to occupy and exclude" others from the land. See Strate, 520 U.S. at 456.

[10] As a result of our limited holding, we need not decide whether Montana's first exception encompasses consensual agreements between tribal members and governmental entities acting in a proprietary, rather than a governmental, capacity. We also express no opinion regarding the ability of the tribes to exercise regulatory authority over States qua States when the regulated activity occurs on Indian land.

Aircraft Serv., Inc. v. City of Pueblo, 679 F.2d 805, 810 (10th Cir. 1982) ("In its 'governmental capacity' a municipality acts as an arm of the state for the public good on behalf of the state rather than itself."). The provision of medical services is unquestionably an exercise of the police power. See Hill v. Colorado, 530 U.S. 703, 715 (2000) ("It is a traditional exercise of the States' police powers to protect the health and safety of their citizens.") (internal quotations omitted); see also Metro. Life Ins. Co. v. Massachusetts, 471 U.S. 724, 758 (1985) (explaining that a mandated-benefit law was a "valid and unexceptional exercise of the . . . police power" where "[i]t was designed in part to ensure that . . . less wealthy [Massachusetts] residents . . . would be provided adequate mental-health treatment should they require it"). Accordingly, the employment relationships between SJHSD and Mr. Riggs and Mr. Dickson were not "private consensual relationships" in any sense of the term and do not fall within the first Montana exception.

b.    The Right to Self-Government Exception

This brings us to Montana's second exception. Again, the exception requires that "the conduct of non-Indians on fee lands within [the] reservation . . . has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." Montana, 450 U.S. at 566. When viewed in isolation, the exception appears broad in scope. The Supreme Court has

- 36 -

cautioned, however, that:

> Read in isolation, the <u>Montana</u> rule's second exception can be misperceived. Key to its proper application, however, is the Court's preface: "Indian tribes retain their inherent power [to punish tribal offenders,] to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members. . . . But [a tribe's inherent power does not reach] beyond what is necessary to protect tribal self-government or to control internal relations." 450 U.S., at 564. Neither regulatory nor adjudicatory authority over the state highway accident at issue is needed to preserve "the right of reservation Indians to make their own laws and be ruled by them." <u>Williams</u>, 358 U.S., at 220. The <u>Montana</u> rule, therefore, and not its exceptions, applies to this case.

<u>Strate</u>, 520 U.S. at 459 (alterations in original). In framing the second exception, the Court also later added: "Tribal assertion of regulatory authority over nonmembers must be connected to th[e] right of the Indians to make their own laws and be governed by them." <u>Hicks</u>, 533 U.S. at 361.

The proper question in this case, then, is whether regulatory authority over Defendants' activities, with the exception of those of Mr. Atcitty, is needed to preserve the Navajo Nation's right to make their own laws and be governed by them. In regard to the County defendants, the district court accurately noted that the Navajo district court "did not find facts showing conduct on the part of any County defendant that threatened or had some direct effect on the political integrity, the economic security, or the health or welfare of the Navajo Nation." <u>MacArthur II</u>, 391 F. Supp. 2d at 1007. The Navajo district court did not find (and neither do we) that the County defendants—including San Juan County, the

San Juan County Commissioners, County Attorney Halls, and County Administrator Bailey—had any role in the complained of activities, other than that they exercised some control over, and provided advice to, SJHSD. Additionally, Mr. Bailey had some role in Plaintiffs' grievance process—he sent grievance decision letters and served as the grievance hearing officer. All of these actions, however, relate exclusively to the governance of SJHSD; they in no way impact the Navajo Nation's ability to make its own laws and be governed by them.

SJHSD's activities also do not affect the Navajo Nation's right to self-government. Despite Plaintiffs' attempts to make more of it, this case essentially boils down to an employment dispute between SJHSD and three of its former employees, two of whom happen to be enrolled members of the Navajo Nation. While the Navajo Nation undoubtedly has an interest in regulating employment relationships between its members and non-Indian employers on the reservation, that interest is not so substantial in this case as to affect the Nation's right to make its own laws and be governed by them. This is particularly evident here, when only two members of the Nation were involved and the employment relationships at issue were carried out on non-Indian land. The right at issue in this case is the Navajo Nation's claimed right to make its own laws and have others be governed by them, not the right to self-government.

We are therefore left with Ms. Lauren Schafer (SJHSD Personnel Director of Nursing), members of SJHSD's board, and Mr. Wood. Plaintiffs' only complaint about Ms. Schafer is that she failed to do enough to help them in their conflict with SJHSD and Mr. Wood. Moreover, in its orders, the Navajo district court stated only that Ms. Schafer wrote a letter critical of Ms. Singer and that she testified she had discovered only one piece of evidence as to Ms. Singer's intent to commit time card fraud. Failing to help others may violate the "golden rule," but it in no way constitutes an affront to the Navajo Nation's self-governance; and Ms. Schafer's actions vis-à-vis Ms. Singer are irrelevant due to Ms. Singer's lack of membership in the tribe. Next, because the Navajo district court's orders make no mention of the individual members of SJHSD's board and Plaintiffs make no attempt to explain how their activities pose a threat to the tribe's right to make its own laws, it follows that the individual members of the board fall squarely within Montana's general rule. Finally, as previously detailed, the federal district court held that the Navajo Nation possessed authority over Mr. Wood's alleged defaming of Mr. Riggs. To be sure, that alleged defamation may have had a negative impact on Mr. Riggs individually, but based on the record before us we fail to see how it, or any other of Mr. Wood's actions, negatively affected the tribe as a whole or its ability to self-govern.

In sum, with the arguable exception of Mr. Atcitty, the Navajo Nation did

not possess regulatory authority over any of Defendants' activities. Because there exists no adjudicatory authority in the absence of regulatory authority, Strate, 520 U.S. at 453 ("As to nonmembers, we hold, a tribe's adjudicative jurisdiction does not exceed its legislative jurisdiction."), the Navajo district court did not possess jurisdiction over Plaintiffs' claims unrelated to the activities of Mr. Atcitty.

D.     Discretionary Enforcement With Respect to Mr. Atcitty

Although the Navajo district court arguably possessed regulatory authority over Mr. Atcitty as a member of the Navajo Nation, as previously emphasized, the decision whether to enforce the tribal court orders in regard to Mr. Atcitty lies entirely within our discretion. Under the limited circumstances of this case, we choose not to enforce the tribal court orders in this respect.[11] Several considerations guide our decision.

First, as the district court observed, Utah Navajo Health Systems's assumption of control over the operations of the Clinic and Plaintiffs' employment there mooted much, though not all, of the relief afforded in the preliminary injunction orders. Also, while we are not required to refrain from enforcing interlocutory foreign judgments, see Remington Rand Corp. v. Bus.

---

[11] As a result of our refusal to enforce the Navajo district court's orders on other grounds, the portion of Mr. Atcitty's cross-appeal arguing that the Navajo Nation did not possess regulatory authority over him is moot. Nonetheless, we vacate that portion of the federal district court's decision issuing a declaratory judgment that the Navajo district court possessed jurisdiction over Mr. Atcitty.

<u>Sys. Inc.</u>, 830 F.2d 1260, 1266 (3d Cir. 1987) ("[J]udicial acts need not always be final judgments to be granted comity.") (citing <u>In re Colorado Corp.</u>, 531 F.2d 463, 469 (10th Cir. 1976)); Restatement (Second) Conflict of Laws § 92 and cmt. c, § 98 (1971), the amorphous and incomplete nature of the orders at issue renders them nearly incapable of enforcement. Much of the relief that is not now moot has not been reduced to a sum certain; consequently, determining what portions of the orders are amenable to enforcement would be impracticable.

Third, despite the fact that Mr. Atcitty's status as an enrolled member of the Navajo Nation arguably imbued the Navajo district court with civil jurisdiction, the activities for which he was sued have little or nothing to do with his status as an enrolled member of the tribe. Normally the lack of a nexus between tribal membership and the claims at issue will not necessarily pose an impediment to enforcement, but here the lawsuit against Mr. Atcitty stems completely from his status as a government employee of the State of Utah. Thus, the same considerations which lead us to conclude that the tribes do not possess jurisdiction over States qua States on state land lead us to conclude that enforcement against Mr. Atcitty should be refused. Finally, it appears that Mr. Atcitty played an extremely minor role in the incidents at issue. His role was confined to membership on SJHSD's board, and he is not even mentioned by name in any of the preliminary injunction orders. Thus, it would be inequitable to

enforce the Navajo district court's extremely broad orders against him alone.[12]

In sum, we REVERSE the federal district court insofar as it issued a declaratory judgment that the Navajo Nation possessed civil jurisdiction over the employment-related claims of Mr. Riggs and Mr. Singer against SJHSD. We also REVERSE the district court insofar as it issued a declaratory judgment that the Navajo Nation possessed civil jurisdiction over Mr. Riggs's defamation claim against Reid Wood. We VACATE the district court's issuance of a declaratory judgment that the Navajo Nation possessed civil jurisdiction over Plaintiffs' claims against Roger Atcitty. Finally, we AFFIRM the district court's judgment refusing to enforce the Navajo district court's orders.

---

[12] Because we decide the case on alternative grounds, we need not address the parties' arguments regarding Defendants' sovereign immunity.